UNIVERSAL MONEY CENTERS, INC., Plaintiff–Appellant,

v.

AMERICAN TELEPHONE & TELE-GRAPH CO., and Universal Bank, Defendants–Appellees.

No. 92–3259.

United States Court of Appeals, Tenth Circuit.

April 29, 1994.

Carter H. Kokjer (Joseph B. Bowman, Kokjer, Kircher, Bowman & Johnson, P.C., Kansas City, MO, on the briefs), Kokjer, Kircher, Bowman & Johnson, P.C., Kansas City, MO, for plaintiff-appellant.

Kirk T. May, of Rouse, Hendricks, German, May & Shank, P.C., Kansas City, MO, for defendants-appellees. Noah J. Hanft, of AT & T Universal Card Services Corp., Jacksonville, FL, of counsel.

Before TACHA, BRORBY, and EBEL, Circuit Judges.

TACHA, Circuit Judge.

Plaintiff-appellant Universal Money Centers, Inc. ("UMC") filed an action against defendant-appellee American Telephone and Telegraph Co. ("AT & T") alleging trademark infringement as a result of AT & T's use of the word "Universal" to describe its combination telephone and retail credit card. The district court entered an order granting AT & T's motion for summary judgment. UMC appeals. We exercise jurisdiction under 28 U.S.C. § 1291 and 15 U.S.C. § 1121 and affirm.

## I. Background

UMC is a Missouri corporation with its principal offices in Shawnee Mission, Kansas, and is the owner of four registered trademarks incorporating the word "UNIVERSAL": (1) "UNIVERSAL MONEY CARD" (with the words "MONEY CARD" disclaimed); (2) "UNIVERSAL MONEY CENTER" (with the words "MONEY CENTER" disclaimed); (3) "UNIVERSAL MONEY" and design (with the word "MONEY" disclaimed); and (4) "UNIVERSAL MONEY" (with the word "MONEY" disclaimed). Since 1981, UMC has provided electronic banking services and has contracted with various financial institutions to issue to their customers plastic electronic banking cards bearing one of UMC's trademarks. (See Appendix.)

UMC has approximately 160,000 cardholders throughout the United States. UMC cardholders may use their cards to purchase goods and services at selected retail establishments, to access selected insurance products, and to obtain cash from automatic teller machines ("ATMs") operated by UMC or from ATMs owned by organizations such as American Express, Discover, Cirrus and BankMate with whom UMC has an association or affiliation through an electronic funds transfer network. Reciprocally, the cardholders of these affiliated organizations may use their cards in any of the ATMs operated by UMC. UMC customarily places its trademarks on its electronic banking cards, on printed material accompanying the cards when the cards are mailed to customers, on ATM receipts, on signs displayed at banks and business establishments accepting UMC's cards and on the ATMs themselves.

On March 26, 1990, AT & T introduced a new combination telephone and retail credit card—the "AT & T Universal Card." (See Appendix.) As of February 1991, AT & T had spent over $60 million to promote its card by means of direct mail and telemarketing campaigns and by advertising in the media, including national newspapers, magazines and television. AT & T has more than 10,000,000 cardholders. The AT & T Universal Card is affiliated with Visa and MasterCard and may be used to place telephone

calls, to make purchases at retail stores affiliated with VISA and MasterCard and to obtain cash from ATMs displaying the "Plus" or "VISA" logos. AT & T cardholders cannot use their cards to obtain cash from ATMs operated by UMC because AT & T and UMC are not affiliated.

UMC first became aware of the AT & T Universal Card on March 26, 1990, when some UMC executives and employees saw an AT & T television commercial broadcast during the Academy Awards presentation. Shortly thereafter, UMC filed a motion for a preliminary injunction seeking to enjoin AT & T[1] from using the term "Universal" in connection with the AT & T Universal Card on the basis that AT & T's use of the term constituted trademark infringement under 15 U.S.C. § 1114(1), false designation of origin under 15 U.S.C. § 1125(a), and unfair competition under state common law. On August 30, 1990, the district court issued an order denying UMC's motion for a preliminary injunction. UMC then amended its complaint by adding a request for money damages.

On November 7, 1991, AT & T filed a motion for summary judgment. The court granted AT & T's motion on June 16, 1992, finding as a matter of law that AT & T's use of the word "Universal" is not likely to cause confusion as to the source of the AT & T Universal Card or the source of UMC's products and services, 797 F.Supp. 891. UMC now appeals.

## II. Discussion

### A. Standard of Review

We review the grant of summary judgment de novo, using the same standard applied by the district court. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics*, 912 F.2d at 1241.

While the party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact, the moving party need not negate the nonmovant's claim, but need only point out to the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the moving party carries this initial burden, the party opposing the motion for summary judgment "may not rest upon mere allegations or denials of his pleading," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), but "must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics*, 912 F.2d at 1241 (emphasis added); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. An issue of material fact is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. at 2512.

### B. Likelihood of Confusion

The unauthorized use of "any reproduction, counterfeit, copy, or colorable imitation" of a registered trademark in a way that "is likely to cause confusion" in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act. 15 U.S.C. § 1114(1)(a); *see Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts II)*, 805 F.2d 920, 924 (10th Cir.1986); *see also Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482,

---

1. UMC later added Universal Bank as a defendant. Universal Bank is the bank sponsor of the

AT & T Universal Card.

1484 (10th Cir.1987) (noting that a similar test is used for false designation of origin claims under 15 U.S.C. § 1125(a)). Notwithstanding the fact that UMC's registered trademarks have become incontestable under 15 U.S.C. § 1065, "[t]he party alleging infringement has the burden of proving likelihood of confusion." *Jordache*, 828 F.2d at 1484. Thus, to prevail on its claims, UMC must demonstrate that AT & T's use of the term "Universal" is likely to cause consumers to believe either that UMC is the source of the AT & T Universal Card (direct confusion), or alternatively, that AT & T is the source of UMC's products and services (reverse confusion). *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir.1992) (noting that several circuits have found reverse confusion to be a valid basis for a trademark infringement claim under the Lanham Act), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993); *see also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1371–72 (10th Cir.1977) (establishing the doctrine of "reverse confusion"), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

The following factors are considered in determining whether there is a likelihood of confusion between two marks:

(a) the degree of similarity between the designation and the trade-mark or trade name in

   (i) appearance;

   (ii) pronunciation of the words used;

   (iii) verbal translation of the pictures or designs involved;

   (iv) suggestion;

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers.

*Jordache*, 828 F.2d at 1484. "This list is not exhaustive. All of the factors are interrelated, and no one factor is dispositive." *Id.* In this case, for example, evidence of actual confusion and the strength or weakness of UMC's trademarks are two additional relevant factors. *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993) (listing evidence of actual confusion and strength or weakness of trademark as relevant factors); *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 606 (1st Cir.1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993); *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir.1992) (same).

After examining the above four factors as well as evidence of actual confusion and the strength of UMC's marks, the district court concluded as a matter of law that consumers in the marketplace are not likely to be confused. UMC contends that the district court erred in granting summary judgment because conflicting evidence of confusion demonstrates that a genuine factual dispute exists. Because we find that a reasonable jury could not conclude that AT & T's use of the word "Universal" is likely to cause confusion as to the source of the AT & T Universal card or UMC's products and services, we affirm the district court's grant of summary judgment.[2]

## 1. Similarity of the Marks

     The degree of similarity between marks is tested on three levels as encountered in the marketplace: sight, sound, and

---

2. UMC suggests that trademark infringement cases should not be decided at the summary judgment stage because they involve complex factual issues and require credibility determinations. While we agree that the issue of likelihood of confusion is a question of fact, *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 661 (10th Cir.1987), this does not preclude the entry of summary judgment in trademark infringement cases. Indeed, as the Second Circuit has pointed out,

    courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source. Though likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases.

    *Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir.1983) (citations omitted).

meaning. *Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts I)*, 711 F.2d 934, 940 (10th Cir.1983). In evaluating similarity, we must not engage in a "side-by-side" comparison. *Id.* at 941. Rather, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Id.* Further, similarities between marks should be given more weight than differences. *Jordache*, 828 F.2d at 1485.

We agree with the district court that reasonable jurors could only conclude that "the degree of similarity between UMC's registered trademarks and the mark 'AT & T Universal Card' is minimal." First, the appearance of the marks is strikingly dissimilar, thus precluding confusion even when the marks are "singly presented." Although both marks use the word "universal," significant differences exist in the overall design of AT & T's card and UMC's cards and ATM markings, including the lettering styles, logos and coloring schemes. UMC never uses the UNIVERSAL mark alone, but always uses it with "MONEY"—UNIVERSAL MONEY, UNIVERSAL MONEY CARD, and UNIVERSAL MONEY CENTER. AT & T, on the other hand, never uses the word "Universal" with the word "money," but rather with the AT & T mark. Unlike AT & T's card, neither the Visa nor the MasterCard logo appear on UMC's cards. In addition, a significant number of UMC's cards are not primarily marked as "UNIVERSAL MONEY" cards at all, but instead display the name of an affiliate bank on the front of the card. Second, the marks have different sounds and cadences—"AT & T Universal Card" versus "Universal Money." Third, largely relating back to the first two factors, the two marks do not convey the same idea or stimulate the same mental reaction. *See Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir.1958).

Despite these marked differences, UMC argues that a question for the jury exists because the word "Universal" on AT & T's card is equal in prominence to the house mark of "AT & T," and "yet is set off from [the mark "AT & T"] so as to assume a significance of its own in a manner that is confusingly similar to the name 'UNIVERSAL' on [UMC's] money card." This argument misses the mark.

While it is true that the dominant portion of each mark is entitled to greater weight in evaluating the likelihood of confusion, each mark is to be considered as a whole. *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570–71 (Fed.Cir.1983). Even assuming that the word "Universal" is the dominant portion of AT & T's mark, the mark as a whole clearly is not "confusingly similar" to UMC's marks, especially in light of the distinctive AT & T house mark prominently displayed on the front of AT & T's card. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981) (affirming summary judgment for defendant Polaroid in part because Polaroid's logo was clearly displayed on its products and advertising). Moreover, UMC's argument is based on the erroneous contention that, just because the words "MONEY CARD," "MONEY CENTER," and "MONEY" have been disclaimed by the United States Patent and Trademark Office as descriptive of the services UMC renders, this court must make its comparison by focusing primarily on the "UNIVERSAL" mark on UMC's card. Our focus, however, is not so limited. "[T]he disclaimed material still forms a part of the mark[s] and cannot be ignored in determining likelihood of confusion." *Giant Food*, 710 F.2d at 1570. In short, the differences between the marks greatly outweigh any similarities.

### 2. Intent of AT & T in Adopting the Term "Universal"

AT & T selected the word "Universal" to describe its new combination calling and retail credit card after several employees suggested the word in a "name game" contest and after conducting consumer reaction studies. In accordance with AT & T's normal operating procedures, AT & T's in-house trademark counsel then conducted a trademark search of the word "universal." Her search turned up approximately 200 registered marks using the word "universal," including UMC's marks. She analyzed UMC's marks in their entirety, concluded that there was no likelihood of confusion, and advised

AT & T business personnel that the word "universal" was available, but that its use posed a risk because the word was widely used and because AT & T was "particularly vulnerable to complaints of infringement because we are AT & T."

The district court concluded that "the record is void of any evidence that AT & T chose the term 'Universal' with the intent of copying UMC's marks or confusing the public as to the sponsorship or affiliation of its card." On appeal, UMC alleges that the facts surrounding AT & T's adoption of the word "Universal" raise a genuine issue of material fact as to AT & T's intent. We disagree. Although the "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion," *Beer Nuts II*, 805 F.2d at 927, "mere knowledge [of a similar mark] should not foreclose further inquiry," *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990). "The proper focus [remains] whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache*, 828 F.2d at 1485 (internal quotations omitted). Here, viewing the evidence in the light most favorable to UMC, there are absolutely no facts to support an inference that AT & T adopted the word "Universal" with the intent to derive benefit from UMC's marks. AT & T's in-house trademark counsel undoubtedly knew about UMC's federally registered marks and that UMC and other owners of the mark might challenge AT & T's use of the word "universal." However, in the larger factual context of this case, this is simply not enough. Indeed, the fact that AT & T has spent more than $60 million in promoting its card strongly suggests that AT & T is relying on its own publicity and reputation, and not on that of UMC. *See Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F.Supp. 1185, 1201 (S.D.N.Y.1979), *aff'd*, 636 F.2d 1203 (2d Cir.1980).

### 3. Similarity of Services and Manner of Marketing Services

#### a. Similarity of services

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 505 (5th Cir. 1980). The district court found that reasonable jurors could conclude only that the services offered through the cards are substantially different, pointing out that the UMC cards are used primarily to obtain cash from ATMs with the additional ability to make certain retail *debit* purchases and to access selected insurance products, whereas the AT & T Universal Card is a *credit* card used primarily to make long-distance telephone calls and retail purchases with the additional benefit of obtaining cash from ATMs. We find this distinction to be overly technical for purposes of the "likelihood of confusion" test. The services offered through the cards are similar even though technical differences exist as to their manner of operation and primary purpose. Both cards can be used to obtain cash at ATMs, both can be used to make selected retail purchases, and both can be used to access selected insurance benefits. Nevertheless, though this factor weighs in UMC's favor, it carries little weight in light of the fact that the marks themselves are strikingly dissimilar.

#### b. Similarity in manner of marketing services

AT & T has spent millions of dollars advertising and promoting the AT & T Universal Card directly to the public through a variety of media sources. In contrast, UMC currently does not advertise directly to the public. Rather, UMC markets its services primarily to financial institutions who, in turn, market cards to their own account-holders. The district court concluded, and we agree, that these significant differences in the parties' methods of advertising curtail the possibility of confusion. *See Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 558 (N.D.Ill.1984).

UMC nevertheless contends that a genuine factual issue exists because both cards are distributed by sponsoring banks through the mail with accompanying promotional materials which explain the accessible services and methods of use. Though both cards are is-

sued by a sponsoring bank, the distribution process cannot be said to create confusion in this case. Someone desiring an AT & T Universal Card must first seek out and consciously select AT & T as the card provider. Thus, AT & T customers are aware that they are receiving an AT & T card. Someone desiring a UMC card may only receive a card if he or she has an account at a financial institution that is affiliated with UMC. Thus, UMC cardholders are not given the impression that they are receiving a UMC card, but rather a particular financial institution's ATM card. In the end, the fact that the sponsoring bank may send both cards in the mail with documentation is irrelevant.

### 4. Degree of Care Exercised by Consumers

The fourth factor relevant to the likelihood of confusion inquiry is the degree of care with which consumers choose the products in the marketplace. *Beer Nuts I*, 711 F.2d at 941. Based on the uncontroverted testimony of AT & T cardholders, the district court concluded that consumers exercise at least moderate care in choosing between providers of ATM cards. *See Omaha Nat'l Bank v. Citibank (S. Dakota), N.A.*, 633 F.Supp. 231, 235–36 (D.Neb.1986) (holding that consumers exercise a relatively high degree of care when choosing between providers of ATM cards). UMC does not dispute the fact that consumers exercise moderate care in *choosing* an ATM card. Rather, UMC argues that consumers exercise a low degree of care when *using* their ATM cards, thus supporting its claim of likelihood of confusion.

We agree with UMC that the inquiry in this case should focus on the consumers' actions at the time they use their cards rather than when they choose an ATM card provider because the purpose of the inquiry is to determine the degree of care used by consumers at the time of "purchase." One does not make a "purchase" when selecting a provider of an ATM card. Rather, one purchases products and services when one uses the ATM card. We also agree with UMC that consumers exercise a low degree of care when using their ATM cards. This much is evident from a number of affidavits from AT & T's own cardholders, who stated that they thought ATMs accepted almost any type of card.

Nevertheless, the same AT & T customer affidavits demonstrate that the low degree of care exercised by consumers when using their ATM cards does not create a material factual issue regarding the likelihood of confusion in this case. The affiants stated that their use of the AT & T Universal Card in UMC ATMs was not the result of any confusing similarities between the two marks. They "just figured any machine was going to work." Thus, UMC's argument proves too much—any ATM card can be confused with any other ATM card or machine, notwithstanding any similarities between the marks on the cards or machines.

### 5. Strength of the Mark

Although not specifically listed as a relevant factor in *Beer Nuts II*, we believe the district court properly considered the relative weakness of UMC's marks. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Exxon*, 628 F.2d at 504. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion" between any two specific goods incorporating the weak mark. *Id.* (quoting Restatement of Torts § 729, comment g (1938)). As the district court stated:

> Here, UMC has clearly used its marks for a substantial period of time. Nonetheless, the evidence produced by AT & T and uncontroverted by UMC indicates that the term "Universal" is widely used by parties other than UMC. In particular, the term is in use by approximately six financial institutions throughout the country who have used the term on their own ATM cards. The term is also in use by two credit card companies ("Universal Gold Card" and "Universal Premiere Card") [which] have issued approximately 240,000 credit cards displaying the term. Further, Dun & Bradstreet shows over 200 active businesses employing the term. In short,

the term is used by a significant number of entities and is thus a relatively weak mark.

## 6. Actual Confusion

Actual confusion in the marketplace is often considered the best evidence of likelihood of confusion. *Jordache*, 828 F.2d 1487. In support of its motion for summary judgment, AT & T offered the results of a thorough market research survey conducted by Dr. Thomas DuPont.[3] The survey involved interviews with 303 of approximately 400 AT & T cardholders who attempted to use their AT & T Universal Cards in UMC ATMs from April 1990 to December 1990. The data showed that, at most, 2.6% of these cardholders appeared to make an association or connection between the word "UNIVERSAL" on the ATMs and the word "Universal" on the AT & T Universal Card. Dr. DuPont concluded that 2.6% is a de minimis number and that it is extremely unlikely that consumers make any connection or association between the AT & T Universal Card and UMC.

As further evidence of the lack of actual confusion in the marketplace, AT & T offered the testimony and affidavits of 40 of the 400 AT & T cardholders who attempted to use their cards in a UMC ATM. A sample of the cardholders' affidavits and testimonies is enlightening. Danny Ray Cox stated:

> I am not familiar with the various ATM networks. My understanding and experience has been that ATMs generally accept almost any type of card. I am not familiar with, nor have I ever heard of, Universal Money. The fact that Universal Money's logo may have been on the Metro North Bank ATM had nothing to do with why I tried my AT & T card at that ATM.

Stephen G. Hopfinger similarly stated:

> On October 5, 1990 I attempted to use my AT & T Universal Visa Card to obtain cash from the ATM at the Merchants Bank on Westport Road, Kansas City, MO. I had never used my AT & T Universal Visa Card to obtain cash from an ATM before this occasion. I did not know if my AT & T Universal Visa Card would work in the ATM at the Merchants Bank, but I thought I would try it anyway because I was near the bank and needed cash. The ATM at the Merchants Bank rejected my AT & T card.

> . . . .

> The fact that Universal Money Centers' logo may have been on the Merchants Bank's ATM had nothing to do with why I tried my AT & T Universal Visa Card at that ATM. I have never heard of Universal Money Centers.

Wolfgang Webern testified as follows:

Q. Now, why did you think you could use your AT & T Universal Card at the ATM at the 7–11 store on St. Charles Rock Road?

A. Because I've used another card, a Discover Card, I had used that in the same machine. It had a different personal identification number, and it worked, and I assumed because the Discover Card worked, that this card would also work, and I was mainly going there to try this out with the different personal identification number that I had.

. . . .

Q. Okay. Do you recall seeing a Universal Money Center or a Universal Money sign on the ATM?

A. No.

Q. Okay, and do you know that your AT & T Universal Card had the word universal on its face?

A. Yes.

Q. Now, did the fact that the word universal was on your AT & T Universal Card and the fact that the word Universal Money or Universal Money Center may have been on the ATM, have anything to do with why you thought you

**3.** Surveys can be used as evidence of actual confusion, "but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122, 1126 (10th Cir.1991). Dr. DuPont is an expert in the field of marketing research, consumer behavior and marketing and consumer communications. UMC did not challenge his qualifications and did not controvert that the survey was conducted in compliance with generally accepted survey principles and recognized professional survey standards.

could use your AT & T Universal Card in that ATM?

A. No. I just thought it was a money machine, and since I had used the other credit card, that this one would work also.

Judy Gail Huber Pollan testified:

Q. I want to make sure this is clear for the record. Is it fair to say that you did not decide to use this machine because of any Universal Money or Universal Money Center sign on the machine?

A. Yes.

Q. That was not a reason why you—

A. That was not the reason why I used it. It is just an ATM, and I went to an ATM. I never even put Universal together with anything.

In opposition to AT & T's motion for summary judgment, UMC submitted the affidavit of Marilyn Campo, UMC's Special Projects Coordinator, in which she states that 14 of 64 AT & T cardholders contacted as part of a UMC telephone poll said they used the AT & T Universal Card in a UMC ATM because the word "universal" was displayed on both the card and the ATM. Additionally, Dave Windhorst, UMC's Senior Vice–President, testified that UMC is receiving complaints and inquiries from cardholders and financial institutions about any affiliation between UMC's ATM card and the AT & T Universal Card. Without providing any underlying data, he testified further that AT & T's cardholders are attempting to use their cards in UMC ATMs at a rate approximately 4.5 times greater than would be expected based on the number of AT & T Universal Cards outstanding as compared to other third-party cards. UMC also offered the results of Dr. DuPont's survey and the testimony of Richard Fjellman, an AT & T cardholder who attempted to use his AT & T Universal Card in a UMC ATM.[4] UMC alleges that this evidence of actual confusion creates a material factual issue regarding the likelihood of confusion. We disagree.

Because we must view the evidence in the light most favorable to UMC, *Applied Genetics*, 912 F.2d at 1241, we assume that the employee affidavits, the survey results and Mr. Fjellman's testimony constitute some evidence of actual confusion, though this is a generous interpretation of the record. Nevertheless, evidence of some actual confusion does not dictate a finding of likelihood of confusion. *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir.1990) (stating that "[t]hough evidence of actual confusion may be the best evidence of likelihood of confusion, it is not conclusive of its existence"). We find these isolated instances of actual confusion to be de minimis. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23.02[2][b], at 29 (3d ed. 1992) ("Evidence of actual confusion of a very limited scope may be dismissed as de minimis: 'Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification.'") (quoting *McGraw–Hill Pub. Co. v. American Aviation Assocs., Inc.*, 117 F.2d 293, 295 (D.C.Cir.1940)). De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion, especially where, as here, AT & T has introduced substantial, reliable evidence in support of its motion for summary judgment demonstrating no significant actual confusion in the marketplace. *See Woodsmith*, 904 F.2d at 1249 (holding that some evidence of actual confusion does not create a genuine issue of material fact regarding likelihood of confusion where defendant presents evidence providing a "reasonable explanation and serving to discount for [the] isolated instances of confusion"). The de minimis evidence of actual confusion is especially undermined

---

4. UMC offered two other pieces of evidence, neither of which demonstrates actual confusion. First, UMC introduced an AT & T cardholder's vitriolic response to a UMC inquiry regarding the use of her AT & T Universal Card at a UMC ATM. The cardholder's response, however, does not show that she was confused by the similarity of the marks, but merely shows that she was confused about the litigation between UMC and AT & T. Second, UMC offered the deposition testimony of Judy Qualkinbush, Assistant Vice–President of Blue Springs Bank. Ms. Qualkinbush's testimony, however, does not show actual confusion. She merely testified that, upon seeing the AT & T Universal Card, she was "concerned" that her bank's customers would be confused, even though she did not think the card was affiliated with UMC in any way.

in this case by the sheer lack of similarity between the marks. We therefore conclude, as did the district court, that UMC failed to come forth with sufficient "specific facts [of actual confusion] showing that there is a genuine issue for trial" on the likelihood of confusion issue. *Applied Genetics,* 912 F.2d at 1241.

In sum, though none of the six factors alone is dispositive, we conclude as a matter of law that there is no likelihood of confusion between the two marks. UMC's failure to sufficiently rebut AT & T's preliminary showing of no significant actual confusion in the marketplace, particularly in light of the fact that the two marks are strikingly dissimilar, convinces us that a "reasonable jury could [not] return a verdict for [UMC]." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Therefore, no genuine issue of material fact exists for trial and summary judgment is appropriate.

## C. Outstanding Discovery Requests

■ During discovery, UMC requested that AT & T disclose the identity of all cardholders located within a thirty mile radius of the Kansas City and St. Louis metropolitan areas. AT & T responded by listing the number of accounts opened per month in the designated areas and by objecting to the request for the identity of each cardholder. UMC then filed a motion to compel AT & T to provide complete responses and to impose sanctions against AT & T. The district court found UMC's motion moot when it granted AT & T's motion for summary judgment.

UMC contends that summary judgment is premature because the district court never ruled on UMC's motion to compel. According to UMC, obtaining the requested information will enable it to conduct a survey of the Kansas City and St. Louis AT & T Universal Card cardholders and thereby "pursue further relevant evidence of actual consumer confusion which goes to the issue of likelihood of confusion."

The rule is clear: "Although the Supreme Court has held that, under Fed.R.Civ.P. 56(f), summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition, this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." *Dreiling v. Peugeot Motors of Am., Inc.,* 850 F.2d 1373, 1376 (10th Cir.1988) (internal quotations and citations omitted); *see also Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 832–33 (10th Cir.1986) ("Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate."). Here, UMC failed to file a Rule 56(f) affidavit explaining why it could not present facts to oppose AT & T's motion.

Additionally, even if we assume that strict compliance with the rule is not required and acknowledge that the district court was apprised of UMC's alleged need for the requested discovery by virtue of UMC's outstanding motion to compel, UMC has failed to demonstrate "how additional time will enable [it] to rebut [AT & T]'s allegations of no genuine issue of fact," *Dreiling,* 850 F.2d at 1377 (quoting *Patty Precision v. Brown & Sharpe Mfg. Co.,* 742 F.2d 1260, 1264 (10th Cir.1984)), as is also required of a Rule 56(f) affidavit. Surveying AT & T cardholders in the Kansas City and St. Louis metropolitan areas is not likely to produce significant evidence of actual confusion because none of these cardholders have attempted to use their cards in UMC ATMs. The 400 AT & T cardholders who actually attempted to use their cards in UMC ATMs is the pool of cardholders most likely to show significant confusion, and a study of these cardholders has already been completed, showing that even those in this pool were not confused. Moreover, though UMC had the opportunity, it failed to conduct a thorough survey of the 400 AT & T cardholders.[5] UMC contends

5. The law firm representing UMC sent letters to some of the 400 AT & T cardholders explaining the firm's representation of UMC and "respect-

fully requesting" that the AT & T cardholders sign and date an enclosed form. The form accompanying each letter read as follows:

that it was precluded from completing an unbiased survey of the 400 AT & T cardholders because they had been tainted by Dr. DuPont's previous survey. Even so, Dr. DuPont's survey itself clearly demonstrates that only a de minimis 2.6% of the 400 cardholders appeared to make any association between the two marks, and we fail to see how surveying Kansas City and St. Louis cardholders who never attempted to use their AT & T Universal Cards in UMC ATMs can possibly produce more evidence of actual confusion than Dr. DuPont's thorough survey.

## III.   Conclusion

We find that a reasonable jury could not conclude that AT & T's use of the word "Universal" is likely to cause confusion as to the source of the AT & T Universal card or UMC's products and services. We AFFIRM the district court's grant of summary judgment in favor of AT & T.

> To Whom It May Concern:
>    I have used my AT & T Universal Card in a Universal Money ATM machine and my requested transaction was rejected.
>    At the time I attempted the said transaction, I believed that my AT & T Universal Card would work in the Universal Money ATM because the name "UNIVERSAL" appeared both on my card and the involved ATM machine.
> Signed: _____
> Dated: _____
> None of the AT & T cardholders signed and returned this form.

We also point out that, after identifying the 400 AT & T cardholders who attempted to use their cards in UMC ATMs from April 1990 to December 1990, UMC abandoned the process of identifying attempted AT & T Universal Card uses at the direction of its legal counsel. Thus, UMC's own failure to continue identifying the AT & T cardholders who were attempting to use their cards in UMC ATMs has prevented it from surveying other AT & T cardholders in the pool most likely to show signs of confusion.

## APPENDIX

UMC's Trademarks

(1)

(2)

(3)

(4)

AT&T Universal Card

EBEL, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision that a reasonable jury could not conclude that AT & T's use of the word "Universal" on its multiuse financial and phone card is likely to cause confusion as to the source of the AT & T Universal card or UMC's products and services. I think UMC presented enough evidence that, when taken in the light most favorable to it, a reasonable jury could find in its favor. Additionally, I think the district court erred when it granted AT & T summary judgment despite UMC's repeated requests for discovery. Applying the same summary judgment standard that the majority articulated, I would find that there is a genuine issue of material fact in dispute.

UMC's evidence includes the fact that in a nine month period, in a limited geographic area, 400 AT & T cardholders attempted to use their cards in UMC's ATMs. The AT & T card displays the word "Universal" in the upper right-hand corner of the card, the AT & T logo in the upper left-hand corner, and the Visa logo in the lower right-hand corner.

Thus, a cardholder might think that the AT & T card is sponsored both by Visa and by Universal. Additionally, AT & T's own expert found some evidence of actual confusion.

Moreover, as the majority acknowledges, UMC submitted affidavits from two employees that showed actual confusion on the part of AT & T customers. Marilyn Campo, UMC's Special Projects Coordinator, stated that she conducted a phone survey of 64 AT & T cardholders who had used their card in one of UMC's ATMs and that 14 of them (22%) said they used their AT & T card in the UMC ATM because the name "Universal" appeared on both. Mr. Windhorst, Senior Vice–President of UMC, stated that AT & T cardholders were 4.5 times more likely to use their card in UMC's ATMs than other ATM users who did not use a UMC card. Mr. Windhorst also testified that UMC had received complaints and inquiries from cardholders and financial institutions about any affiliation between AT & T and UMC.

The majority dismisses UMC's evidence of actual confusion as de minimis, and instead places much weight on Dr. DuPont's survey, which itself found some actual confusion. The majority, and AT & T, however, fail to explain why UMC's telephone survey of 64 of the same 400 cardholders that encompassed the universe for Dr. DuPont's survey yielded a 22% rate of confusion, while Dr. DuPont's yielded only a 2.6% rate of confusion. Moreover, no explanation is provided that would explain, as anything but confusion, the evidence that AT & T cardholders are 4.5 times more likely to attempt to use their card in UMC's ATMs than other ATM users who did not use a UMC card. At a minimum, these affidavits call into question Dr. DuPont's results and clearly raise a material issue of fact that should have been resolved by a jury. UMC also offered the testimony of the Assistant Vice–President of a bank that utilized UMC's Universal Money Card who expressed concern that the bank's customers would confuse the AT & T Universal card with UMC's Universal Money Card.

It is the jury who should weigh the evidence rather than a judge on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). The two cards present significant similarity in both emphasizing the word "Universal." UMC bolstered that evidence with expert testimony, surveys, and anecdotal evidence of actual confusion. This seems to me to be more than sufficient to establish a genuine dispute of material fact going to the issue of likelihood of confusion. I would reverse the granting of summary judgment.

In addition, UMC's repeated requests for discovery should have caused the district court to deny AT & T summary judgment at this stage in the proceedings. The record shows an ongoing attempt by UMC to obtain discovery from AT & T and AT & T's repeated failure to comply with UMC's requests. UMC first sent interrogatories to AT & T requesting the number of open and active AT & T "Universal" accounts and the names and addresses for the accounts within the Kansas City, Kansas and St. Louis, Missouri metropolitan areas. AT & T's refusal to provide the information prompted UMC's motion to compel discovery and impose sanctions against AT & T. Judge O'Connor held that UMC's "geographical designations [were] vague and ambiguous. However, because the requested information is relevant, the court will allow plaintiff to reword these interrogatories and provide the defendants with more specific guidelines." Dist.Ct. Order at 2, Oct. 17, 1991. UMC then remedied the "vague geographical designations" and sent to AT & T substantially the same interrogatories requesting the same information, including names and addresses, for all active and open accounts within a specified thirty mile radius in Kansas City, Kansas and St. Louis, Missouri.[1]

1. UMC requested the following for both cities: For each month from March 1990 to the present, list the name, address, phone number and original date of card issue for each person who

is a cardholder of a card of AT & T or Universal Bank bearing the name UNIVERSAL or AT & T UNIVERSAL and whose address is within a 30 mile radius of [812 North 7th Street,

AT & T responded first by providing raw numbers of its accounts in the two cities. After UMC filed another Motion to Compel Answers on January 13, 1992, AT & T provided additional numbers for open accounts and cards issued in each city for each month. At no time, however, did AT & T provide the name, address, phone number and original date of card issue for each account. Without this information, UMC could not conduct a survey of AT & T cardholders in the specified areas to determine the likelihood of, or actual confusion caused by, use of the name "Universal." [2]

The majority dismissed this issue, in part, because it did not think that a survey of AT & T cardholders would "likely produce significant evidence of actual confusion because none of these cardholders has attempted to use their cards in UMC ATMs." However, this assumes that those who have never used their card at an ATM would not be confused about common sponsorship of the cards and UMC's ATMs; there is no evidence to support such conjecture, especially at the summary judgment stage. The majority's position also assumes that those who have used their cards in an ATM, but have not used them in UMC's ATMs, are necessarily not confused. An equally plausible explanation is that some cardholders regularly use one or two ATMs that are close to work or home and have not yet been faced with using their AT & T card at an unfamiliar ATM. Of course, this is all conjecture because AT & T's refusal to comply with UMC's discovery request has precluded UMC from obtaining an answer.

The majority also dismisses UMC's discovery request because UMC failed to survey the 400 cardholders who did use their cards in UMC's ATMs—cardholders who presumably were most likely to be confused. However, the majority fails to give credence to UMC's reasonable complaint that AT & T had already surveyed these cardholders, and therefore perhaps biased the sample, before AT & T released the names and addresses of the cardholders to UMC. AT & T now argues that UMC should be forced to survey only the same cardholders, despite the court's earlier discovery order.[3]

Moreover, there is evidence that one of UMC's employees did contact sixty-four of those same 400 hundred cardholders and determined that fourteen of them, 22%, were actually confused about the sponsorship of the products. Dr. DuPont claimed to have surveyed 303 of the 400 AT & T cardholders and determined that only 8 of them, 2.6%, were confused. Although UMC's telephone survey may not have conformed to the level of scientific methodology ascribed to Dr. DuPont's survey, it at least raises a question as to the validity of Dr. DuPont's results. Additionally, the UMC results should make us even more reluctant to conclude that UMC's proposed survey of other cardholders would not evidence confusion.

As the majority correctly notes, UMC should have filed a Rule 56(f) affidavit explaining why it could not present facts to oppose AT & T's summary judgment motion. The affidavit should have also set forth "how additional time [would] enable [it] to rebut [AT & T]'s allegations of no genuine issue of fact." *Dreiling v. Peugeot Motors of Am.,*

Kansas City, Kansas or 1114 Market Street, St. Louis, Missouri], indicating where appropriate whether the card was cancelled or otherwise discontinued during the month; and
For each month from March 1990 to the present, list the name, address, phone number and original date of card issue for each active and open account for a card of AT & T or Universal Bank bearing the name UNIVERSAL or AT & T UNIVERSAL which account address is within a 30 mile radius of [812 North 7th Street, Kansas City, Kansas or 1114 Market Street, St. Louis, Missouri], indicating where appropriate whether the account was closed during the month.

Appellant's Supplemental Appendix at 315–17, Interrogatories 24 & 25.

**2.** AT & T, quite disingenuously, asserts that UMC should have made it and the court aware of UMC's need for additional discovery.

**3.** The majority is also quick to accept Dr. DuPont's interpretation of the 2.6% rate of confusion as de minimis; however, we were not apprised of the margin of error for this survey. Therefore, Dr. DuPont's assertion that the rate of confusion is de minimis is, at best, conclusory.

*Inc.*, 850 F.2d 1373, 1377 (10th Cir.1988) (quoting *Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1264 (10th Cir. 1984)). However, the instant case is distinguishable from *Dreiling* and *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828 (10th Cir.1986), because in both those cases the court found that the parties opposing summary judgment did not show how additional time would enable them to rebut the movants' allegations that no genuine issue of fact remained. Additionally, the *Pasternak* court found that the nonmovant did not "file an affidavit nor did it otherwise specifically notify the district court of the necessity of conducting additional discovery to permit it to oppose summary judgment." *Pasternak*, 790 F.2d at 833. Likewise, in *Dreiling*, the court noted that the nonmovant requested an immediate trial date and made only general statements about its inability to depose Chrysler's and Peugeot's highest officers.

In the instant case, however, the district court and AT & T knew full well about UMC's pending motion to compel discovery so that it could obtain the information necessary to conduct its own survey to refute AT & T's evidence that there was little or no confusion. In fact, on October 17, 1991, the court ordered AT & T to provide UMC the requested information once UMC submitted a geographically specific interrogatory. It was the second motion to compel answers to substantially the same questions, filed on January 13, 1992, that the court held moot as a result of granting AT & T's summary judgment request. Appellant Supplemental Appendix at 321. The discovery issue became moot only because the court never enforced its original order despite its ruling that the information UMC sought was "relevant." Dist.Ct. Order at 2, Oct. 17, 1991. Somehow it seems circular to me to assert that a discovery request is moot because summary judgment has been entered and then also to justify the summary judgment as appropriate because the nonmoving party did not advise the court of the need for more discovery.

Thus, I would hold that despite UMC's failure to file a 56(f) affidavit, the court was adequately informed that UMC needed the requested discovery to conduct a survey to refute AT & T's survey and that summary judgment was therefore improper until after AT & T complied with the discovery requests and UMC had enough time to make use of the information. To do otherwise simply rewards AT & T for its evasive and unresponsive answers to interrogatories that the district court previously decided were "relevant." Dist.Ct. Order, Oct. 17, 1991.

Accordingly, I would reverse.