**BIG O TIRES, INC., Plaintiff,**

v.

**BIGFOOT 4X4, INC. and Vulcan Chain and Webbing Products, Inc., Defendants.**

No. CIV. A. 01–B–349.

United States District Court, D. Colorado.

Sept. 26, 2001.

Harold R. Bruno, III, Richard D. Judd, Stephen L. Waters, Robinson, Waters & O'Dorisio, P.C., Denver, CO, for plaintiff.

Pamela A. Johnson, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BABCOCK, Chief Judge.

Plaintiff, Big O Tires, Inc. ("Big O") brings suit for trademark infringement, dilution, false designation, false representation of origin, false advertising, deceptive trade practices, and unfair competition against Defendants Bigfoot 4x4 ("Bigfoot 4 × 4") and Vulcan Chain and Webbing Products, Inc. ("Vulcan") (collectively "Defendants"). Bigfoot 4 × 4 counter-claims for abuse of process. Big O moves for a preliminary injunction. The motion is adequately briefed and a hearing was held on May 31, June 1, and August 24, 2001. For the reasons set forth below, I grant Big O's motion.

### I. Facts and Procedural History

Big O is a Nevada corporation with its principal place of business in Englewood, Colorado. Big O operates a network of more than 500 franchised stores in North America. The stores sell after market parts and accessories for vehicles, and offer installation of some of those parts. Franchisees contribute to both national and local advertising funds. All advertising is administered through these funds, resulting in continuity of information disseminated to the public throughout the franchise system.

Tires make up the largest portion of Big O's sales. Big O sells its own branded tires, as well as tires manufactured by other national companies. The largest category of its tire sales is a brand of Big O tires called "Big Foot." In addition, Big O stores sell non-tire parts and accessories, such as wheels, shocks, suspension kits, oil filters, wiper blades, studs, and chains. In fiscal year 2000, Big O had total revenues of $171,800,000.

Big O began using the Big Foot name, alternatively styled as both one word and two words, in 1974. The company has linked the name not only with its identically named tires, but with its franchise stores generally. The name Big Foot is often linked in Big O's advertising to a design of a "Big Foot monster" or Sasquatch figure. In some cases the name Big Foot is also used in conjunction with a large footprint designed to appear as that of a Sasquatch. In addition, Big O has linked the Big Foot name to the Big O stores through a pervasive national advertising campaign denoting Big O stores as "Big Foot Country."

From 1978 to 2000, Big O was awarded four different trademarks for the Big Foot mark. All four cover the use of the mark in conjunction with vehicle tires. The fourth, Registration Number 2,314,775 also covers "retail stores featuring automotive tires, parts and related accessories" and "vehicle maintenance and repair services." *See* Exhibit 47. The Big Foot name appears prominently on the branded tires, as well as on store displays, promotional items, and point-of-sale materials. The name also appears on or next to a variety of automotive accessories. Big O estimates that its Big Foot mark appears in approximately 90% of national advertising and 50% of local advertising. Since the late 1980's, Big O has spent approximately $100,000,000. on advertising under the Big Foot mark.

Bigfoot 4 × 4 is a Missouri corporation formed in 1980 by Bob and Marilyn Chandler. The company grew out of Mr. Chandler's work repairing his own, and eventually other drivers', 4 × 4 trucks. Mr. Chandler began putting over-sized tires on

his 4 × 4 trucks, creating a "monster" truck. His first monster truck was named "Bigfoot," in reference to Mr. Chandler's heavy use of the gas pedal. The name "BIGFOOT" was painted on the truck, and the Chandlers began showing the truck at races, events, and exhibitions. At the time the first Bigfoot truck was created, the Chandlers owned a company called Midwest Four Wheel Drive. In 1980 they incorporated Bigfoot 4 × 4 in order to separate funds generated by and used for the Bigfoot monster trucks. Both companies were owned and operated by the Chandlers, their family, and friends. In 1992 the assets of Midwest were acquired by Bigfoot 4 × 4 and Midwest ceased to exist.

Bigfoot 4 × 4 eventually developed a small fleet of monster trucks, all named Bigfoot, to appear at events and races throughout the country. Each Bigfoot monster truck has a number of sponsors who donate parts or supplies for the trucks, in return for placement of decals or stickers on the monster trucks indicating the use of those parts. Bigfoot 4 × 4 operates a single store in St. Louis, Missouri which sells souvenirs and novelty items such as clothing, posters, key chains, stickers, calendars, and toys. It also sells items over the World Wide Web.

In 1983 Bigfoot 4 × 4 filed three applications for federal trademark registration for use of the mark "Bigfoot." Although Big O initially opposed the applications, it withdrew its opposition after being assured by Bigfoot 4 × 4 that the trademarks applied only to novelty items, and not to tires. In 1994 Bigfoot 4 × 4 filed an application for federal trademark registration for use of the mark "Bigfoot" in connection with truck and automotive parts. The United States Patent and Trademark Office ("PTO") rejected the application on the basis that it would create a likelihood of confusion with Big O's prior registrations.

Over the past 15 years, Bigfoot 4 × 4 has sporadically licensed the use of the name Bigfoot for automotive parts or accessories. These have included air fresheners, auto sun shields, and seat cushions. Bigfoot 4 × 4 also licensed the name to Trail Master Products for use on shock absorbers. This product first appeared in 1993. Upon being made aware of the Trail Master product in 1994, Big O sent a cease and desist letter to Trail Master. The shock absorbers thereafter disappeared from the market.

Vulcan is a Michigan corporation with its principal place of business in Detroit, Michigan. Vulcan manufactures and distributes automobile securement systems, for example those used by railroads and tow-trucks to secure automobiles during transportation. Vulcan also manufactures and distributes automobile cargo securement systems, including tie-down straps and nets. Last year Vulcan had gross sales revenues of $10,416,662.

Prior to 1998, Vulcan made attempts to enter into the retail automotive after market. Those attempts were unsuccessful, largely because the Vulcan name was not known to distributors or retailers. In 1998 Vulcan entered into a license agreement with Bigfoot 4 × 4 in order to gain use of a nationally-recognized brand name. The agreement allows Vulcan to use "Bigfoot" and "The Original Monster Truck" in connection with a line of tie-down straps and cargo control products. The agreement provides that Bigfoot 4 × 4 will receive a percentage of sales, although no payments have yet been made. It also provides that Bigfoot 4 × 4 will indemnify Vulcan for the costs of, and any losses associated with, this suit.

After entering into the agreement with Bigfoot 4 × 4, Vulcan created a line of products entitled "Bigfoot by Vulcan," including stretch cords, cargo nets, and tie-

down straps. The packaging has the word "Bigfoot" featured prominently. On some packages the words "by Vulcan" appear underneath in smaller letters. Other products are identified only by the word "Bigfoot" without the addition of "by Vulcan." The line was designed to be sold through large national automotive parts retail chains, such as Advanced Auto Parts and Big O, as well as catalogues and the internet. Total sales for the Bigfoot by Vulcan line have amounted to $61,403.45.

In November 1998 Vulcan launched its Bigfoot by Vulcan line at the SEMA show in Las Vegas. Also in November 1998 Vulcan sent Big O a letter and sample of its marketing materials, describing its potential customer base as identical to Big O's current customers. Big O sent a cease and desist letter to Bigfoot 4 × 4 and Vulcan in January 1999. It thereafter entered into settlement negotiations with Vulcan, followed by settlement negotiations with Bigfoot 4 × 4. Although the parties discussed a joint marketing project, those negotiations failed due to conflicts with Bigfoot 4 × 4's other sponsors. Big O filed this suit on February 27, 2001.

## II. Motion for Preliminary Injunction

Big O moves for an injunction against both Bigfoot 4 × 4 and Vulcan. Under 15 U.S.C. § 1116(a), federal courts may "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent or Trademark office ...." These injunctions must comply with the requirements of Federal Rule of Civil Procedure 65. *See generally Redken Labs., Inc. v. Levin,* 843 F.2d 226, 228 (6th Cir.1988).

A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court. *See Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). Preliminary injunction is an ex-

traordinary remedy— an exception rather than the rule. *See GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984). Thus, the right to relief must be clear and unequivocal. *See Penn v. San Juan Hosp.,* 528 F.2d 1181, 1185 (10th Cir.1975). *See generally* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948m at 428–29 nn. 19–21 (1973 & 1991 Supp.). "[I]t is 'a well-settled principle that an injunction must be narrowly tailored to remedy the harm shown.'" *Davoll v. Webb,* 955 F.Supp. 110, 113 (D.Colo. 1997) (citing *Citizen Band Potawatomi Indian Tribe of Okla. v. Oklahoma Tax Comm'n,* 969 F.2d 943, 948 (10th Cir. 1992)).

The burden is on the movant to make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Id.* A preliminary injunction may issue if the movant clearly shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) the preliminary injunction is not adverse to the public interest. *See SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991); *Lundgrin,* 619 F.2d at 63.

In the Tenth Circuit, the following types of preliminary injunctions are disfavored and require the movant to satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in his favor before such an injunction may be issued: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits. *See Visa,* 936 F.2d at 1098–

99.　Here, the injunction sought would disturb the status quo.　Thus, Big O must show that the four *Visa* factors weigh heavily and compellingly in its favor.　Big O has met this burden.　I now consider the four *Visa* factors.

## A.　Likelihood of Success on the Merits

██　Big O's primary cause of action is for trademark infringement.　Pursuant to 15 U.S.C. § 1114(1)(a),

> Any person who shall, without the consent of the registrant ... use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion,* or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

*Id.* (emphasis added).　To prove infringement, the moving party must show: (1) the mark is validly registered; (2) defendants' use of the mark was unauthorized; and (3) defendants' use is likely to cause confusion in the market place concerning the source or quality of the products.　*See Durango Herald, Inc. v. Riddle,* 719 F.Supp. 941, 948 (D.Colo.1988) (citing *USA Network v. Gannett Co. Inc.,* 584 F.Supp. 195, 198 (D.Colo.1984)).　The parties agree that the only issue is whether Defendants' use of the term "Bigfoot by Vulcan" is likely to cause confusion with Big O's registered "Bigfoot" mark.

██　Likelihood of confusion forms the gravamen for a trademark infringement action.　*See King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1089 (10th Cir.1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)).　The Tenth Circuit has identified six factors, derived from the Restatement of Torts § 729 (1938), that aid in determining whether a likelihood of confusion exists between two marks:　(a) the degree of similarity between the marks;　(b) the intent of the alleged infringer in adopting its mark;　(c) evidence of actual confusion;　(d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;　(e) the degree of care likely to be exercised by purchasers;　and (f) the strength or weakness of the marks.　*See id., First Sav. Bank, F.S.B. v. First Bank Sys., Inc.,* 101 F.3d 645, 652 (10th Cir. 1996); RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 20–23 (1995).　"This list is not exhaustive.　All of the factors are interrelated, and no one factor is dispositive."　*Universal Money Ctrs. Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1530 (10th Cir.1994).

██　Big O brings suit under the "related goods" doctrine.　Under this rule, "the owner of a registered mark has protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."　*Chrysler Corp. v. Vanzant,* 124 F.3d 210, 1997 WL 547993 *2 (9th Cir. Aug.28, 1997) (citing 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS §§ 24.6; 24:65).　Such a trademark owner may recover for infringement of the trademark beyond the specific goods registered in the trademark.　They may recover for "any goods on which the use of the mark is likely to cause confusion."　*Id. See also Planetary Motion, Inc. v. Techplosion, Inc.,* 261 F.3d 1188 (11th Cir.2001);　15 U.S.C. § 1052(d).

██　This rule is limited, however, by equitable considerations.　"[A] trademark owner cannot by the normal expansion of its business extend the use or registration of its mark to *distinctly different* goods or services not comprehended

by its previous use ... where the result could be a conflict with valuable intervening rights established by another through extensive use ... of the same or similar mark for like or similar goods and services." *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310–11 (11th Cir.1999) (citations and quotations omitted); *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 82 n. 1 (2d Cir.1988). Courts determine the proper scope of protection of a mark in the context of intervening uses by applying the "source or sponsorship" test. Under this test, a trademark owner has "protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Planetary Motion, Inc.*, 261 F.3d 1188 (citing MCCARTHY at § 24:6). Ultimately, the related goods test is "merely a facet of the likelihood of confusion test and therefore requires an inquiry into [the] seven factors affecting the likelihood of confusion ...." *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1027 (11th Cir.1989); 2 J. THOMAS MCCARTHY, TRADEMARK AND UNFAIR COMPETITION § 24:6, at 183 (2d ed. 1984 & Supp. 1991) ("The 'related goods' test is merely a facet of the ultimate and final test of 'likelihood of confusion.' "). I therefore consider each factor in the "likelihood of confusion" test in turn.

### 1. Similarity Between the Marks

I test the degree of similarity between marks on three levels: sight, sound, and meaning. *See, e.g., First Sav. Bank*, 101 F.3d at 653; *Universal Money Ctrs.*, 22 F.3d at 1530–31; *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986). I cannot consider these factors in isolation. Instead, I must examine them "in the context of the marks as a whole as they are encountered by consumers in the marketplace." *Beer Nuts*, 805 F.2d at 925; *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir.1998); *Universal Money Ctrs.*, 22 F.3d at 1531; 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:47 (4th ed.1996). Furthermore, I do not engage in a " 'side-by-side' comparison." *Universal Money Ctrs.*, 22 F.3d at 1531. Rather, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Id.* (internal quotation marks and citation omitted). I give the similarities of the marks more weight than the differences. *See id.; see also King of the Mountain Sports*, 185 F.3d at 1090.

Here, the sight of the two marks is confusingly similar, as both use simply the word Bigfoot. While the two marks differ in color and are occasionally two words rather than one, the differences are not striking enough to diminish their obvious similarity. Neither does the use of the phrase "by Vulcan" underneath the Bigfoot mark obviate the obvious similarities. To the contrary, adding one's own name after the protected mark is an "aggravation, and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor." *Menendez v. Holt*, 128 U.S. 514, 521, 9 S.Ct. 143, 32 L.Ed. 526 (1888) (citation omitted). Indeed, such use may encourage a consumer to believe that Big O licensed, approved, or authorized the use of the word Bigfoot to Vulcan. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 899 (7th Cir.2001) (citing *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988)).

Additionally, the sound of the two marks is identical. Finally, the meaning of the two marks is similar enough to cause con-

fusion. Big O's use of the mark is connected to tires and a tire store, while Vulcan's use involves cargo containment. However, both are closely related to the automobile accessory after market. Thus, I conclude that this factor weighs in favor of Big O.

### 2. Intent of the Defendants

The proper focus under this factor "is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987) (internal quotation marks and citation omitted); *accord Universal Money Ctrs.*, 22 F.3d at 1532. Here, there is evidence that Vulcan intended to derive benefit from the reputation of the word "Bigfoot," as Vulcan's president candidly admitted that his company's name, in isolation, was meaningless in this particular market. However, the evidence suggests that Vulcan intended to derive a benefit from the monster truck context, rather than the tire store context. Further, although Bigfoot 4 × 4 was aware of Big O's existence and possible conflicts between its use of the Bigfoot mark and Big O's registered trademarks, there is no evidence that Bigfoot 4 × 4 intended to derive benefit from the reputation or goodwill of Big O. Although the question is a close one, I conclude that this factor favors Defendants.

### 3. Similarity in Products/Services and Manner of Marketing

Typically, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Universal Money Ctrs.*, 22 F.3d at 1532 (internal quotation marks and citations omitted). This is undoubtedly true when the action pertains to source or affiliation confusion. For example, *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir.1986) involved two competing compa-

nies marketing very similar goods, sweetened salted peanuts, in the same manner. In that case, the Tenth Circuit found that this factor added strength to the position that a reasonable consumer would likely be confused as to the source of the peanuts. *See id.*

Here, although the two products are not identical, they are found by the consumer in similar situations and used by customers in similar markets. Both Big O's products and the Bigfoot 4 × 4/ Vulcan products are sought out by customers searching for replacements parts for, or additions to, their truck or off-road vehicle. The Bigfoot brand of tire is designed for owners of trucks, sports utility vehicles, and off-road vehicles. Likewise, the Bigfoot by Vulcan line is designed for consumers who wish to use their vehicles for activities beyond mere on-road driving. In both cases, customers will seek out these products in retail stores which specialize in after market automotive parts and products. Defendants have sought to place Bigfoot by Vulcan products in stores similar to the Big O stores, and have even sought to placement in Big O stores themselves. I therefore conclude that this factor favors Big O.

### 4. Degree of Care Exercised by Purchasers

"A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade names." *Heartsprings*, 143 F.3d at 557. The suggestion was made by Big O's counsel that purchasers of products for trucks, SUV's, and off-road vehicles are not particularly discriminating customers. Likewise, the suggestion was made by Defendants that such customers exhibit great care in making such purchases. However, no evidence was presented on this point by

either party. I therefore conclude that this factor is neutral.

### 5. Actual Confusion

Although a plaintiff need not set forth evidence of actual confusion to prevail in a trademark infringement action, *see Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 928 (10th Cir.1986), "[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *Universal Money Ctrs.*, 22 F.3d at 1534; *accord Jordache*, 828 F.2d at 1487.

▬ Here, Big O did not present evidence of actual confusion, and it candidly admits that to its knowledge no such confusion has taken place. Big O instead commissioned a consumer survey to show likelihood of confusion. Surveys may be used as evidence of actual confusion, *Universal Money Ctrs., Inc.*, 22 F.3d at 1534 n. 3, "but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122, 1126 (10th Cir.1991).

Big O's survey was designed by Dr. John Burnett, Director of the Marketing Department at the University of Denver. He followed a modified version of the "*Squirt*" survey format. *See SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1092 (8th Cir.1980). In this method, a line-up of products are presented two-by-two to consumers, including the litigants' marks, and the consumers are then asked whether the marks are by the same or different companies. Here, with the assistance of a research survey firm, Dr. Burnett surveyed 300 adults in Chicago, Illinois; Seattle, Washington; Louisville, Kentucky; and Los Angeles, California. Researchers first confirmed that the respondents were over 18, not connected with the automotive industry, not aware of the current litigation, and at least somewhat familiar with names of automotive product manufacturers. *See* Exhibit 168. Respondents were then read five dyads of product names. The dyads were designed to include names that sound similar, either because they alliterated or included the same word. One of the sets was "Big O's Bigfoot" and "Big Foot by Vulcan." Respondents were asked if they believed that the two products in the dyad were owned or operated by the same company. The results showed that 22% of respondents believed that "Big O's Bigfoot" and "Big Foot by Vulcan" were owned or operated by the same company. *See* Exhibits 170–71. Dr. Burnett testified that he found this number statistically significant.

There are, however, defects in Big O's survey which reduce its probative value. First, one important factor in assessing the validity of an opinion poll is the adequacy of the "survey universe;" that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation. *See Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996). Here, the survey universe adequately screened for adults of driving age, but did not specify that the respondents be drivers, car owners, customers in the automotive after market, or drivers of types of vehicles which might use one of the litigants' products. Therefore, although the survey undoubtedly caught some of Big O's customers or potential customers, its focus on the target market was limited. *See Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 n. 6 (10th Cir.1987) (holding that universe of persons over 14 years old who had fished in freshwater during previous twelve months sampled persons likely to purchase fishing reels and was therefore probative of likelihood of confusion in trademark infringement action between two fishing reel manufacturers); *Jellibeans, Inc. v. Skat-*

*ing Clubs of Georgia, Inc.*, 716 F.2d 833, 845 n. 24 (11th Cir.1983) (ruling that universe of persons between ages twelve and twenty-four who had roller-skated in the last year was adequate survey sample and probative of actual confusion in deceptive trade practice action between two roller rink operators); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir.1980) (ruling that universe of women found at home during daylight hours was inadequate survey universe in trademark infringement action by maker of Domino Sugar against Domino's Pizza because the survey "neglected completely defendants' primary customers young, single, male college students").

Second, although the survey found that 22 % of the respondents believed that "Big O's Bigfoot" and "Big Foot by Vulcan" were owned or operated by the same company, the survey had a margin of error of ± 4.7%. The original 22% value is between one and four percent off from the other four dyads. However, when the margin of error is accounted for, the resulting percentage becomes less statistically significant.

I conclude that the survey's chosen universe and statistical error rate mar the results of the survey, and makes the survey less probative. The survey is not so flawed, however, as to render it irrelevant. I therefore conclude that this factor weighs in favor of Big O, if only slightly.

### 6. Strength of Plaintiff's Mark

 The stronger a trademark, the more likely that encroachment upon it will lead to sponsorship confusion. *See First Sav. Bank*, 101 F.3d at 653. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Id.* (internal quotation marks and citation omitted). To assess the relative strength of a mark,

one must consider the two aspects of strength: (1) "Conceptual Strength: the placement of the mark on the [distinctiveness or fanciful-suggestive-descriptive] spectrum;" and (2) "Commercial Strength: the marketplace recognition value of the mark." 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:47 (4th ed.1996); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1093 (10th Cir.1999).

Under the conceptual strength prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:1 (4th ed.1996); *see also Heartsprings*, 143 F.3d at 555. " 'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." MCCARTHY at § 11:5. "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Id.* §§ 11:11. Suggestive marks are those that suggest some quality or ingredient of the goods. *See id.* §§ 11.62. Often the line between arbitrary and suggestive is difficult to distinguish. *See id.* §§ 11:12.

 Big O presented evidence that it adopted the mark "Big Foot" after the Sasquatch monster, Bigfoot. Thus, Big O asserts the term "Big Foot" is arbitrary in relation to automobile tires, having no descriptive power. Defendants admit that Big O's mark is either arbitrary or suggestive. *See* Defendants' Second Amended Proposed Findings of Fact and Conclusions of Law for Hearing on Preliminary Injunction at ¶ 115. As no further evidence was presented to indicate that use of

the mark Bigfoot was intended to suggest some quality or ingredient of the goods, I conclude that Big O's mark is arbitrary, and thus is quite strong.

The commercial strength prong measures the marketplace recognition value of the mark. The amount of money spent on advertising by the senior user, although not automatically indicative of consumer recognition, is relevant to the analysis. See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 224 (3rd Cir.2000). Here, Big O has spent over $100,000,000 advertising under the Bigfoot mark. This substantial sum, spent both locally and nationally and over a period of years, has undoubtedly resulted in increased recognition of Big O's Bigfoot mark.

Defendants argue, however, that Big O's mark is weakened by the large number of other companies that have registered the Bigfoot trademark in relation to other products. I disagree. Defendants are correct that suggestive or arbitrary marks may be weak marks where they are used in connection with a number of different products. See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 222 (3rd Cir.2000); Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93–94 (4th Cir.1997). While the extent of third-party registration is rele-· vant to the issue at hand, Defendants failed to introduce any evidence of the other alleged trademarks or the extent of use of those other registered marks. See International Sausage Corp. v. Old Dutch Foods, Inc., 904 F.2d 46, 1990 WL 67882 *1, 17 U.S.P.Q.2d 1255 (Fed.Cir.1990). I therefore conclude that when considering the evidence presented as to both the conceptual and commercial strength of Big O's mark, that this factor weighs in favor of Big O.

A majority of factors in the likelihood of confusion test weigh in favor of Big O. I therefore conclude that Big O has shown a likelihood of success on the merits, meeting the heightened first prong of the Visa test.

### B. Irreparable Injury

██ In trademark cases, irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion. See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 169 (3rd Cir.2000); International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir.1993); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n. 3 (9th Cir.1989); Amoco Oil Co. v. Rainbow Snow, Inc., 809 F.2d 656, 664 (10th Cir.1987); Polo Fashions, Inc. v. B. Boman & Co., Inc., 1986 WL 4073, 229 U.S.P.Q. 701 (S.D.N.Y. Apr.01, 1986). Because Big O has shown sufficient likelihood of confusion, and no evidence has been presented to rebut the presumption of substantial irreparable injury, I conclude that this Visa test factor has been satisfied.

### C. Balance of Injury Versus Harm

██ The threatened injury to Big O outweighs the possible harm that a preliminary injunction will cause either Bigfoot 4 × 4 or Vulcan. As I have already concluded, the likelihood of harm to Big O without a preliminary injunction is substantial and irreparable.

Vulcan, however, faces potentially substantial harm if a preliminary injunction is entered. Vulcan's president testified regarding its substantial expenditures, in excess of $500,000.00, in support of the Bigfoot by Vulcan product line. These costs include exhibitions, catalogues, product development, and carrying costs on current inventory. Vulcan also contends that a preliminary injunction may effectively obliterate all future opportunity to enter the relevant market. However, three fac-

tors mitigate against this harm. First, the Bigfoot by Vulcan line represents a minimal portion of Vulcan's yearly revenues, and there is no non-speculative evidence to suggest that sales were destined to greatly enlarge in the near future. Second, Vulcan's license contract with Bigfoot 4 × 4 requires that Bigfoot 4 × 4 indemnify Vulcan for its losses and litigation costs. Finally, Vulcan was aware by the beginning of 1999 that a trademark dispute existed. Thus, it cannot now be heard to complain of expenses that could have been avoided by prudent action at an earlier time. *See Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 197 (3rd Cir.1990) (citing *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 859 (7th Cir.1982); *Ideal Indus., Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir.1979)).

Bigfoot 4 × 4 will itself suffer no appreciable harm from a preliminary injunction. It has not yet been paid any revenues under the license agreement, and there is no evidence that drastically increased revenues would soon appear. Bigfoot 4 × 4 does face potential harm from its contractual duty to indemnify Vulcan for Vulcan's costs. However, as yet Vulcan has made few sales and no true profit from its Bigfoot line of products, resulting in little in the way of current losses.

### D. Public Interest

▮▮▮▮ "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 197 (3rd Cir.1990) (citations omitted); 2 McCARTHY, § 30:21; *Tsunami Softgoods, Inc. v. Tsunami International, Inc.,* 2001 WL 670926 *6 (D.Utah Jan.19, 2001); *Prime Media, Inc. v. Primedia, Inc.,* 33 F.Supp.2d 932, 941 (D.Kan.1998); *Supershuttle Intern. Inc. v. Schafer–Schonewill & Associates*

*Inc.,* 1995 WL 880776 *5 (D.Colo.1995). Having established a likelihood of consumer confusion created by the concurrent use of the Bigfoot marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon Defendants use of the mark would eliminate that confusion. I therefore conclude that a preliminary injunction is in the public interest.

### E. Laches

▮▮▮ Defendants argue that Big O is barred from receiving injunctive relief under the doctrine of laches. Laches consists of two elements: (1) inexcusable delay in instituting suit; and (2) resulting prejudice to defendant from such delay. *See Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 523 (10th Cir.1987) (citing *University of Pittsburgh v. Champion Prods., Inc.,* 686 F.2d 1040, 1044 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982)). "[W]hile laches may not be sufficient to bar a permanent injunction it may well be a bar to preliminary relief. A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues." *GTE Corp. v. Williams,* 731 F.2d 676, 679 (10th Cir. 1984).

▮▮▮ Defendants argue that Big O delayed in several ways. First, Defendants argue that Big O should have acted in the 1980s and 1990s when Big O became aware that Bigfoot 4 × 4 had a number of "Bigfoot" items for sale, including t-shirts and posters. I disagree. A laches analysis " 'assumes the existence of an infringement for an extended period prior to the

commencement of litigation.'" *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 570 (6th Cir.2000) (quoting *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)). Any delay attributable to a plaintiff must be measured from the time the plaintiff knew or should have known that infringement had ripened into a provable claim. *See Kason Indus., Inc. v. Component Hardware Group*, 120 F.3d 1199, 1206 (11th Cir.1997) ("[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement."); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed.Cir.1995) (holding that the trigger for delay begins when the plaintiff's "right ripens into one entitled to protection") (citation omitted). *See also Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65 (10th Cir.1958). Delay is also excusable "where an alleged infringer at first sold different products in a different market through different distribution channels" later coming in direct competition with the plaintiff. *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1345 (11th Cir.1996).

Defendants cite to Big O's knowledge that Bigfoot 4 × 4 was selling t-shirts and posters displaying a Bigfoot logo in connection with the monster truck in the mid 1980's from its St. Louis store. However, there is no evidence that at the time the novelties were being sold Big O had similar products in the same market. *See SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1345 (11th Cir.1996). Without evidence of direct competition, Big O could not have brought a good faith action at that time and, thus, cannot now be charged with laches for failing to act.

Defendants next argue that Big O should have acted when Bigfoot 4 × 4 filed its trademark applications, or when Big O learned of the Trail Master shock absorbers. I disagree. The evidence contradicts the underlying assertion that Big O failed to act promptly at these times. First, Big O filed timely oppositions to the trademark applications. Big O withdrew its oppositions only after receiving assurances from Bigfoot 4 × 4 that no direct competition was intended or would occur. Second, Big O sent Trail Master a cease and desist letter, taking no further action when it believed that the Trail Master product had been removed from the market. I therefore conclude that Big O acted reasonably in these two situations.

■ Finally, Defendants argue that Big O unreasonably delayed by engaging in negotiations with both Vulcan and Bigfoot 4 × 4 before bringing suit. I again disagree. As a matter of public policy, the law favors and encourages settlements. *See Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir.1985); *Amoco Prod. Co. v. Federal Power Comm'n*, 465 F.2d 1350 (10th Cir.1972). The settlement of actions should be fostered to avoid protracted, wasteful and expensive litigation. *See Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972). Particularly in complex cases the litigants should be encouraged to determine their respective rights between themselves. *See* MANUAL FOR COMPLEX LITIGATION (SECOND) § 23.11 (1985). Therefore, delays resulting from good faith attempts to negotiation a settlement in the trademark context do not result in laches. *See Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 508 (9th Cir.1991); *Siegerist v. Blaw–Knox Co.*, 414 F.2d 375, 381 (8th Cir.1969).

■ Moreover, even if I assume Big O could have filed suit earlier, Big O first became aware of the Bigfoot by Vulcan products in late 1998. It filed suit in February 2001. A two-year delay does not itself constitute laches. *See Brunswick*

*Corp. v. Spinit Reel Co.*, 832 F.2d 513, 524 (10th Cir.1987) (delay of one year did not constitute inexcusable delay); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987) (implying that delay of less than two years would not constitute laches); *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 933 (7th Cir.1984) (two years has rarely been held sufficient delay to establish laches); *Black Hills Jewelry Mfg. v. Gold Rush, Inc.*, 633 F.2d 746, 754 (8th Cir. 1980) (eighteen months between defendant's first use of trade name and plaintiff's suit was insufficient delay to establish laches); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (mere passage of time does not constitute laches; defendant must also have been lulled into false sense of security and act in reliance). A "court's finding that the delay was 'reasonable' equates with a finding that there was no delay and that the first element of the laches defense had not been established." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 n. 75 (11th Cir.1986); *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1206 (11th Cir.1997). I therefore conclude that Big O did not unreasonably delay filing suit, and thus the defense of laches does not apply.

### F. Unclean Hands

■ Defendants next argue that the doctrine of unclean hands bars Big O's requested relief. "A trademark plaintiff with unclean hands is one whose conduct relative to his mark has been so illegal or unconscionable that the court will refuse to hear him." 1A J. GILSON, TRADEMARK PROTECTION AND PRACTICE § 8.12[13][a], at 8–295 to 8–296 (1990 ed.); *Tsunami Softgoods, Inc. v. Tsunami International, Inc.*, 2001 WL 670926* 6 n. 5 (D.Utah Jan.19, 2001). Defendants argue that Big O used a cartoon truck in its advertisements which arguably looks like Bigfoot 4 × 4's trademarked truck picture and, thus, Big O deliberately attempted to create confusion in the marketplace. I disagree. The only evidence on this point was testimony that the truck in Big O's ads was a Jeep, and not a monster truck. Without further evidence that Big O deliberately infringed on the Bigfoot 4 × 4 trademark and attempted to create confusion, I cannot conclude that Big O's actions in using this symbol were so illegal or unconscionable as to bar it from the court.

Because Big O has met the four *Visa* factors, I conclude that issuance of a preliminary injunction is appropriate.

Accordingly, IT IS ORDERED that:

1. Plaintiff's motion for additional temporary injunctive relief is GRANTED;

2. Defendants Bigfoot 4 × 4 and Vulcan Chain and Webbing Products, Inc., and their respective directors, officers, agents, employees and all other persons acting on behalf of, or in concert with, Bigfoot 4 × 4 and/ or Vulcan are hereby enjoined from applying the trademark "Bigfoot" to any Vulcan product, packaging, or point of sale materials;

3. Defendant Bigfoot 4 × 4 and its respective directors, officers, agents, employees and all other persons acting on behalf of, or in concert with, Bigfoot 4 × 4 is enjoined from directly or indirectly applying, or causing others to apply the trademark "Bigfoot" to any automotive part or accessory product;

4. Defendant Bigfoot 4 × 4 and its respective directors, officers, agents, employees and all other persons acting on behalf of, or in concert with, Bigfoot 4 × 4 is enjoined from licensing the trademark "Bigfoot" for any automotive part or accessory product; and

5. Bigfoot 4 × 4 is not enjoined from using the "Bigfoot" designation in con-

nection with conducting monster truck or other vehicle entertainment events, or the sponsorship of monster trucks or events, including but not limited to placing decals of any sponsor, including Vulcan, on any monster truck owned by Bigfoot 4 × 4;

6. Bigfoot 4 × 4 is not enjoined from using the "Bigfoot" designation in connection with advertising placed by current sponsors of the Bigfoot 4 × 4 monster trucks;

7. Bigfoot 4 × 4 is not enjoined from using the "Bigfoot" designation in connection with the sale of promotional items, including but not limited to toys, caps, clothing, novelties, or any other item which is not an automotive part or accessory; and

8. Big O shall post a bond in the amount of $500,000.00 as security for the payment of any damages which Bigfoot 4 × 4 or Vulcan can establish it has suffered in the event this injunction is later found to have been issued improvidently.