FILED
United States Court of Appeals
Tenth Circuit

March 19, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENT CIRCUIT**

---

HORNADY MANUFACTURING
COMPANY, INC., a Nebraska
corporation,

     Plaintiff - Appellant,

v.

DOUBLETAP, INC., a Utah
corporation,

     Defendant - Appellee.

No. 13-4085

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:11-CV-00018-TS)**

---

Mark Miller, (Brett L. Foster and Ginger Utley of Holland & Hart, L.L.P., Salt
Lake City, Utah; and Marcy G. Glenn of Holland & Hart, L.L.P., Denver,
Colorado, on the briefs), for Plaintiff - Appellant.

Justin Starr, (James T. Burton and Joshua S. Rupp of Kirton, McConkie, with him
on the brief), Salt Lake City, Utah, for Defendant - Appellee.

---

Before **KELLY**, **HOLLOWAY**, and **PHILLIPS**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

     Plaintiff–Appellant Hornady Manufacturing Company, Inc., appeals from a

district court order granting summary judgment to Defendant–Appellee DoubleTap, Inc., on Hornady's trademark infringement claims. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Hornady was founded in 1949 by Joyce Hornady. Aplt. App. 1047. Since that time, Hornady has manufactured and sold firearm ammunition and related products. Id. It sells its products through brick-and-mortar retailers, its websites, and direct-to-consumer sales, including direct sales to law enforcement agencies. Id. at 1048-49.

Since 1997, Hornady has sold various products under the name "TAP," short for "Tactical Application Police." Id. at 1047, 1061. These products include the sub-brands TAP, TAP FPD, TAP URBAN, TAP PRECISION, TAP CQ, TAP BARRIER, BTHP TAP, and GMX TAP. Id. at 1047; see, e.g., id. at 1084. In 1999, Hornady acquired trademark registration for the nonstylized word mark, "TAP." Id. at 1052; TAP, Registration No. 2,259,161. Hornady holds nonstylized word mark registrations for other TAP sub-brands. Aplt. App. 1054-58. In 2004, the TAP mark became statutorily incontestable under 15 U.S.C. § 1065. Id. at 924-25. Photographs in the record indicate that the packaging for Hornady's products conspicuously features the TAP mark, both as a stand-alone mark and as incorporated within a shield resembling a police officer's badge.

See, e.g., id. at 635-46, 1060-98.



DoubleTap was founded in 2002 by Michael McNett. Id. at 618.

DoubleTap has been described as a "niche" ammunition manufacturer. Id. at 651.

It specializes in hand-loaded rounds, id. at 653, and produces calibers rarely

offered by other ammunition manufacturers, id. at 651. Mr. McNett registered the

domain name www.doubletapammo.com in 2003 and began selling DoubleTap

products online thereafter. Id. at 619. Photographs in the record indicate that, as

of 2006, packaging for DoubleTap's products displayed its mark as two separate

words—"Double Tap"—within a blue oval and flanked to the left by two bullet

holes. Id. at 71, 73. Sometime after 2010, the mark morphed into a single

word—"DOUBLETAP"—presented in a blue oval and crowned with the

identifier, "McNett's." Id. at 75.



In January 2010, Hornady sent DoubleTap a cease-and-desist letter, demanding that DoubleTap discontinue using the word "Tap" on its products, remove "Tap" from its website, and destroy any materials it created bearing "Tap." Id. at 93. Efforts to resolve the dispute failed, and this litigation ensued. Hornady's complaint alleged trademark infringement under Sections 32 and 43(a) of the Lanham Act,[1] common law trademark infringement, deceptive trade practices under Utah law, and unjust enrichment. Id. at 41-44. Both parties moved for summary judgment, arguing that they were entitled to judgment as a matter of law on whether DoubleTap infringed on Hornady's TAP mark. The district court denied Hornady's motion and granted DoubleTap's. Aplee. Br. Att. 24-25. Hornady appealed.

Discussion

We review summary judgment de novo, applying the same standard that the district court should have applied. Water Pik, Inc. v. Med-Systems, Inc., 726 F.3d 1136, 1143 (10th Cir. 2013). Summary judgment is appropriate if the pleadings and record demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The nonmoving party is entitled to reasonable inferences from the record; but if the nonmovant bears the burden of persuasion, summary judgment

_____

[1] The Lanham (Trademark) Act, 15 U.S.C. §§ 1051–1141n.

- 4 -

may be granted if the movant points out a lack of evidence to support the claim and the nonmovant cannot identify specific facts to the contrary. Water Pik, 726 F.3d at 1143-44. Even if the nonmovant produces some evidence, summary judgment may be granted if that evidence is "not significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

Whether proceeding under § 32 or § 43(a) of the Lanham Act, "the central inquiry is the same: whether the junior user's mark is likely to cause confusion with the senior user's mark." Water Pik, 726 F.3d at 1143. Likelihood of confusion is a question of fact, but one amenable to summary judgment in appropriate circumstances. Id.; see also Utah Lighthouse Ministry v. Found. for Apologetic Info. & Res., 527 F.3d 1045, 1055 (10th Cir. 2008). We examine six nonexhaustive factors to evaluate whether there is a likelihood of confusion: (1) the degree of similarity between the competing marks; (2) the intent of the alleged infringer in adopting the contested mark; (3) evidence of actual confusion; (4) the similarity of the parties' products and the manner in which the parties market them; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the strength of the contesting mark. Water Pik, 726 F.3d at 1143.

No one of the six factors is dispositive, and "a genuine dispute of material fact will not exist if all relevant factors, properly analyzed and considered together, . . . indicate consumers are not likely to be confused." Heartsprings,

- 5 -

Inc. v. Heartspring, Inc., 143 F.3d 550, 558 (10th Cir. 1998). The factors are interrelated, and the "importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor." Water Pik, 726 F.3d at 1143. At all times "the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." Team Tires Plus, Ltd. v. Tires Plus, Inc., 394 F.3d 831, 833 (10th Cir. 2005) (internal quotation marks omitted).

Hornady argues that summary judgment was inappropriate because likelihood of confusion was a genuine issue of fact. Aplt. Br. 28. It further argues that the district court impermissibly "weighed evidence" in its analysis of certain factors. Id. at 30. We apply the six-factor test to evaluate the likelihood of confusion between the TAP and DoubleTap marks, addressing Hornady's specific challenges to the district court's analysis below.

A.    Similarity of the Marks

The similarity of the marks is the "first and most important factor." King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1091 (10th Cir. 1999). Similarity is gauged on three levels: "sight, sound, and meaning." Id. at 1090. Similarities in the marks get "more weight than the differences." Id. In comparing marks, "we do not independently examine each syllable of the marks but consider the mark as a whole as they are encountered by consumers in the marketplace." Water Pik, 726 F.3d at 1155 (internal quotation marks omitted).

We therefore compare the full marks, not just their components. Id. at 1156.

Hornady argues for a different approach to similarity. It first argues that the district court erred by not elevating the marks' one similarity—the word "tap"—above all differences. Aplt. Br. 29-30, 33. Hornady next argues that the district court erred by considering differences created by the parties' packaging. Aplt. Br. 35, 37-43. The district court did not err in either regard.

First, the court is not free to give dispositive weight to any one component of the marks, such as a shared syllable. Water Pik, 726 F.3d at 1155. Marks must be considered as a whole. Id. In Universal Money Centers, Inc. v. AT&T Co., we compared the parties' marks in their entirety, including disclaimed words within the mark. 22 F.3d 1527, 1531 (10th Cir. 1994). In Water Pik, this court compared the full words "'Sinu*Cleanse*' and 'SinuSense,' not just the components '*Cleanse*' and 'Sense.'" 726 F.3d at 1156. In this case, the fact that both marks contain the syllable "tap" does not control the similarity inquiry.

Second, in its comparison of the marks, the court is "not free to focus solely on name similarity." Heartsprings, 143 F.3d at 555. The court must consider the effect of marketplace presentation, including "lettering styles, logos and coloring schemes." Universal Money Centers, 22 F.3d at 1531. This includes the effect packaging has on consumers' ability to recognize a particular mark. In Water Pik, we rejected as unrealistic a survey comparison that "did not present the marks as they would appear to a consumer because both marks were shown in

a typewritten format, divorced from packaging." 726 F.3d at 1145. This was despite the fact that the mark at issue was a nonstylized word mark.[2]

Hornady additionally argues that, because its various TAP sub-brands form a "family of marks," it is entitled to an inference that a consumer would presume DoubleTap to be one of its TAP marks. Aplt. Br. 33, 34-37. The only tie holding this supposed family together, however, is the word "tap."[3] To hold that DoubleTap is ipso facto a perceived member of this family would violate our command that marks be considered as a whole as they are encountered by consumers in the marketplace, not on one factor such as name alone. See Water Pik, 726 F.3d at 1146. The TAP sub-brands do play one important role: they are each ways in which consumers encounter the TAP mark in the marketplace. As such, they must be compared to DoubleTap for similarities (and differences) in

---

[2]  Hornady argues that its TAP mark qualifies as a "standard character mark," thus entitling it to a similarity analysis devoid of "font style, size, or color" considerations. Aplt. Br. 3 n.1 (quoting 37 C.F.R. § 2.52(a)); id. at 37-43. In Water Pik, however, we considered the infringement of the "nonstylized word mark SINUCLEANSE" among others. 726 F.3d at 1141. Although the mark was a standard character mark, see SINUCLEANSE, Registration No. 3,422,026, we rejected a comparison that presented the mark "differently from the way that it actually appears on packaging," 726 F.3d at 1147. A standard character registration does not override the requirement that likelihood of confusion be measured by the perceptions of consumers in the marketplace, including the effect of packaging. See id. at 1146-47.

[3]  Indeed, Hornady maintains that it did not need to plead or rely on a "family of marks" claim because its claim is based on public association of the "term TAP alone." Aplt. Reply Br. 7.

sight, sound, and meaning.[4]

With these principles in mind, we compare the sight, sound, and meaning of TAP and DoubleTap. Comparing TAP and DoubleTap in visual appearance, they have but one similarity: both carry the word "tap." The placement and use of that word differs between the marks. Hornady uses "TAP" as an identifying prefix in most of its marks, e.g., TAP URBAN, TAP PRECISION, TAP CQ, and TAP BARRIER. It does not use it at the end of a compound word as DoubleTap does. In the two instances where Hornady uses "TAP" as a suffix rather than a prefix—BTHP TAP and GMX TAP—acronyms proceed the mark, not a readily understandable adjective such as "double." The marks themselves thus appear starkly different. Moreover, as the district court recognized, the packaging on which the parties display their marks differs greatly in color scheme and layout. Aplee. Br. Att. 8-9. Finally, most of Hornady's TAP products and its website carry the distinctive "Hornady®" house mark, further diminishing the degree of visual similarity between the marks.[5] See Water Pik, 726 F.3d at 1157.

As for the sound factor, the monosyllabic "tap" does not sound like the

---

[4] Hornady requests this exact analysis: "Consequently, the manner in which Hornady uses its TAP mark in the marketplace, including its use of TAP with other terms, is highly relevant and necessarily informs the consumer's perspective." Aplt. Reply Br. 3.

[5] See Aplt. Br. 5-6, 8; Aplt. App. 1049, 1060-84.

polysyllabic "double tap."[6]

As to meaning, the marks are not similar. Hornady does not dispute that TAP is an acronym for "Tactical Application Police"; it often displays its mark in close proximity to that description. See, e.g., Aplt. App. 1085, 1092, 1182-84. For consumers who view "TAP" in isolation (and who are unfamiliar with the acronym's meaning), "tap" means "to strike lightly." Webster's 9th New Coll. Dictionary 1206 (1991). In contrast, the term "double tap" has a specialized meaning: in gunmanship, a "double tap is a technique of firing two shots in quick succession into a single target." Steve Martini, Double Tap 317 (2005).[7]

Overall, there are more than enough differences between the two marks to weigh this factor in DoubleTap's favor.

Hornady argues that it was impermissible for the district court to refer to the marks' dissimilarity when evaluating the remaining factors. Aplt. Br. 33. Our precedent is to the contrary. "The importance of any particular factor in a specific case can depend on a variety of circumstances, including the force of another factor. For example, if two marks are not at all similar, the degree of consumer care is unlikely to make a difference." Water Pik, 726 F.3d at 1143;

_____

[6] Nor do any of Hornady's other TAP marks bear aural similarity to DoubleTap, especially those composed of acronyms. The district court came to the same conclusion. Aplee. Br. Att. 10.

[7] For another double tap thriller, read Gary J. Crawford, Double Tap (2013), or this one, Greg Trapp, The Doubletap (2004), or maybe this one, Stephen Leather, The Double Tap (1996).

see also Universal Money Centers, 22 F.3d at 1535-36 (evidence of actual confusion undermined "by the sheer lack of similarity between the marks"); cf. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 125 (2d Cir. 2001) (dissimilarity in the marks' appearance "negated an inference of intent to deceive consumers"). The district court did not err by referring to the marks' dissimilarity when analyzing the remaining factors.

B.    DoubleTap's Intent

"Evidence that the alleged infringer chose a mark with the intent to copy, rather than randomly or by accident, typically supports an inference of likelihood of confusion." Utah Lighthouse Ministry, 527 F.3d at 1055. The district court held that the intent factor favored DoubleTap, based on a lack of similarity in the marks and Hornady's failure to produce direct evidence of DoubleTap's intent to copy. Aplee. Br. Att. 12. Hornady argues that it did produce evidence creating a factual issue regarding intent, namely, circumstantial evidence creating an inference of DoubleTap's intent to copy. On summary judgment, however, a nonmovant is entitled to only those inferences that are "reasonable." Water Pik, 726 F.3d at 1143. In this case, the district court correctly held that Hornady's inferences were not reasonable.

First, Hornady argues that an intent to copy can be inferred from the fact that, at the time of its founding, DoubleTap was aware of "Hornady and its products." Aplt. Br. 61. This inference fails: "When we have said that evidence

- 11 -

of intent to copy may justify an inference of likelihood of confusion, we have been referring to copying a particular mark, not copying a competitor's product." Water Pik, 726 F.3d at 1157. Whether DoubleTap's founder was aware of Hornady and its products is irrelevant to whether DoubleTap adopted its mark intending to copy the TAP mark: "The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." Id. at 1158 (quoting Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 745 (2d Cir. 1998)).

Second, Hornady argues that an intent to copy can be inferred from the fact that, after Hornady sent DoubleTap a cease-and-desist letter in January 2010, DoubleTap accelerated its marketing efforts apparently to capitalize on the alleged confusion. Aplt. Br. 61-62. This inference also fails. Under the intent factor, the alleged infringer's intent is measured at the time it "chose" or "adopted" its mark. See Water Pik, 726 F.3d at 1157 (collecting cases). In analyzing intent, we look to evidence of "the process of choosing" a mark, not evidence of events subsequent to its adoption. See id. at 1159. Evidence of DoubleTap's mindset in 2010, when it became aware of Hornady's claim of infringement, is irrelevant to its mindset in 2002, when it adopted the "DoubleTap" mark. Because, as we mentioned, DoubleTap adopted a mark dissimilar to Hornady's, and because no evidence demonstrates DoubleTap's intent to copy Hornady's mark in 2002, this factor weighs in DoubleTap's favor.

C.     Actual Confusion

Evidence of actual confusion in the marketplace is often considered the best evidence of a likelihood of confusion. Id. at 1144. Hornady points to two kinds of actual confusion evidence in this case: direct evidence in the form of telephone calls, a letter, and a post on Hornady's Facebook page; and survey evidence gathered by Luth Research. Aplt. Br. 48, 52. We first address the direct evidence and then turn to the survey.

1.     *Direct Evidence of Actual Confusion*

Hornady cites three pieces of evidence it claims exhibit actual consumer confusion regarding the source of DoubleTap's product: (1) a "half a dozen or so" phone calls between 2009 and 2010 from customers who believed DoubleTap was one of Hornady's TAP products; (2) a March 2012 letter from a sheriff's office thanking Hornady for sending DoubleTap ammunition; and (3) a March 2013 comment on Hornady's Facebook page demonstrating a customer's confusion whether Hornady manufactured DoubleTap. Aplt. Br. 48. The district court dismissed this evidence as "de minimis," and Hornady argues that such a determination was inappropriate on summary judgment. Id. at 49-52.

"We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be de minimis and may be disregarded in the confusion analysis." Water Pik, 726 F.3d at 1150. "[E]vidence of some actual confusion does not dictate a finding of likelihood of confusion." Universal

- 13 -

Money Centers, 22 F.3d at 1535. In Universal Money Centers, we disregarded as de minimis three affidavits alleging confusion, including two by the plaintiff's employees that they had received a number of accounts of customer confusion. Id. In King of the Mountain, we held that evidence of seven episodes of actual confusion was de minimis. 185 F.3d at 1092-93. Finally, in Water Pik, we held that four instances of consumer confusion, including a declaration by a customer that she was confused when deciding between the parties' products, constituted de minimis evidence. 726 F.3d at 1151. Even assuming that the three instances cited by Hornady constitute some evidence of actual confusion, we agree with the district court's assessment that a handful of instances over the ten years in which DoubleTap was in the market constitute de minimis evidence of a likelihood of confusion. Aplee. Br. Att. 16. Moreover, this "de minimis evidence of actual confusion is especially undermined in this case by the sheer lack of similarity between the marks." Universal Money Centers, 22 F.3d at 1535-36.

2. *Survey Evidence*

"Evidence of actual confusion is often introduced through the use of surveys, although their evidentiary value depends on the methodology and questions asked." Water Pik, 726 F.3d at 1144 (quoting Vail Assocs., Inc. v. Vend-Tel-Co., 516 F.3d 853, 864 n.8 (10th Cir. 2008)). The district court gave the Luth Survey—commissioned by DoubleTap—little weight, concluding that it improperly compared the parties' marks "side-by-side." Aplee. Br. Att. 18. Both

- 14 -

parties agree that the district court erred in determining that the survey was of the "side-by-side" variety. Aplt. Br. 52-53; Aplee. Br. 50. We also agree; the Luth Survey presented the parties' products one at a time, thus properly measuring confusion when the allegedly infringing mark is "singly presented, rather than when presented side by side with the protected trademark." Sally Beauty, 304 F.3d at 972. However, other methodological flaws support the district court's conclusion that the Luth Survey was entitled to little weight.[8]

In Water Pik, we agreed that the survey at issue was "devoid of any probative value and therefore irrelevant" because of methodological flaws. 726 F.3d at 1145.[9] Among the survey's flaws was the fact that "the survey questions [were] improperly leading." Id. at 1147. We described the survey as follows:

> Respondents were shown only three products and were asked whether two or more of the products were made by the same company; whether two or more of the products' makers had a business affiliation; and whether one or more of the makers had received permission or approval from one of the others. They could answer yes, no, or not sure.

---

[8] We are not required to restrict ourselves to the district court's stated reasoning, and we may affirm for any reason supported by the record. Brady v. UBS Fin. Servs., Inc., 538 F.3d 1319, 1327 (10th Cir. 2008).

[9] Hornady argues that the weight of expert testimony, such as competing interpretations of a survey, must be tested by the jury, not the court on summary judgment. Aplt. Br. 55. It argues that methodological flaws go to a survey's weight, not its admissibility, and it therefore must be presented to a jury. Aplt. Reply Br. 24. Even on summary judgment, however, the district court may register "concerns about the survey's methodology" and "decid[e] that the survey failed to support a likelihood of confusion." Water Pik, 726 F.3d at 1145.

Id. The Luth Survey followed an identical strategy:

> After viewing [three] packages, respondents were asked
> to answer whether they thought that the [DoubleTap]
> and the Hornady and control[, Federal Premium,]
> packages were: (1) of the same company or owned by
> the first company shown; (2) affiliated with the first
> company shown, (3) had permission from the first
> company shown to use this name on their website, or (4)
> had no affiliation or connection to the first website
> shown, or that they were unsure.

Aplt. App. 130. By suggesting the possibility that DoubleTap might be connected with another brand, and limiting the candidates to Hornady and Federal Premium, the Luth Survey risked sowing confusion between DoubleTap and TAP when none would have arisen otherwise. See Water Pik, 726 F.3d at 1148. This prevented the survey from eliciting responses as they might occur spontaneously in the marketplace. Because of this and other methodological flaws, the Luth Survey is entitled to little weight on the issue of actual confusion.[10]

Presented with no significantly probative evidence of actual confusion, the district court properly weighed this factor in DoubleTap's favor.

D.      Similarity in Products and Marketing

Viewing the evidence in Hornady's favor, there is sufficient evidence to

---

[10] Hornady's expert concluded that, "[w]hile it is impossible to even come close to correcting for the full extent of" the survey's methodological flaws, the results could nonetheless be manipulated in a way that reliably demonstrated a likelihood of confusion. Aplt. App. 508. We do not believe that the survey's myriad flaws can be so readily overlooked, especially considering that Hornady's expert did not take into account the leading nature of the survey's questions.

establish that the parties produce similar products and market them in similar ways.[11]  The district court correctly weighed this factor in Hornady's favor.

E.    Consumer Care

If consumers are likely to exercise a high degree of care in purchasing a certain product, the likelihood of confusion is reduced.  Id. at 1160.  The district court credited DoubleTap with this factor because consumers are not likely to purchase self-defense ammunition carelessly.  Aplee. Br. Att. 20.  Hornady argues that it was entitled to a contrary inference, i.e., that consumers purchase the products at issue with little care because they are "relatively inexpensive."  Aplt. Br. 58.  What is "relatively inexpensive" is hardly clear, particularly without considerations of the quantity or frequency of consumers' purchases.  Nor do any of our cases take this price-determinative approach.  Instead, we focus "on the consumer's degree of care exercised at the time of purchase" and ask whether the item is one commonly "purchased on impulse."  Sally Beauty, 304 F.3d at 975.  Even if the products in this case are "relatively inexpensive" at $13 to $100 a box,[12] Hornady has not presented any evidence that consumers commonly

---

[11]  DoubleTap argues that the parties market their products in different ways, but the fact that both DoubleTap and Hornady advertise in some of the same magazines, e.g., American Handgunner and Shooting Illustrated, is sufficient to credit Hornady with this factor.  Aplt. Br. 14; Aplt. App. 622-23, 1048.

[12]  Hornady's products retail between $13 and $34, and DoubleTap's products retail between $30 and $100.  Aplt. Br. 57.

succumb to impulses and purchase ammunition carelessly. Indeed, the district court had before it an expert opinion that "the purchase of ammunition would constitute a high involvement purchase decision, that is, one in which the consumer gives careful consideration to both the products and brand names being offered." Aplt. App. 133. The district court correctly weighed this factor in DoubleTap's favor.

F.     Strength of the TAP Mark

Likelihood of confusion depends partly on the senior mark's strength, i.e., its capacity to indicate the source of the goods with which it is used. Water Pik, 726 F.3d at 1151. Strength has two components: conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of recognition in the marketplace. See King of the Mountain, 185 F.3d at 1093. The district court concluded that Hornady's TAP mark was both conceptually and commercially strong, and thus weighed the strength factor in Hornady's favor.

1.     *Conceptual Strength*

Conceptual strength is measured on a spectrum of distinctiveness ranging along the following five categories (from least to most distinctive): (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. Water Pik, 726 F.3d at 1152. Only suggestive, arbitrary, and fanciful marks are considered strong in and of themselves. Id. The district court held that Hornady's mark was

suggestive because the definition of "tap" (to strike someone or something with a quick, light blow) and the TAP acronym (Tactical Application Police) suggest the features of TAP products. Aplee. Br. Att. 22. Although it calls that holding "defensible," DoubleTap argues that TAP is merely descriptive. Aplee. Br. 55.

The determination whether a mark is descriptive or suggestive is difficult, and we have endorsed a helpful test for distinguishing between the two categories: suggestive terms "require the buyer to use thought, imagination, or perception to connect the mark with the goods," whereas descriptive terms "directly convey to the buyer the ingredients, qualities, or characteristics of the product." Water Pik, 726 F.3d at 1152-53 (internal quotation marks omitted). Granting all reasonable inferences in Hornady's favor, we agree that "TAP" is suggestive of the features of Hornady's products. "TAP" does not directly convey the characteristics of the product, bullets, in a way that marks such as "After Tan post-tanning lotion" or "5 Minute glue" do. See George & Co. v. Imagination Entm't Ltd., 575 F.3d 383, 394 (4th Cir. 2009). Even when the acronym is defined, "TAP" requires the consumer to use imagination to appreciate the nature of Hornady's product: police agencies are frequent purchasers of ammunition; police are likely to seek out certain qualities in the ammunition they purchase; a product targeted at police is likely to have these qualities. See 2 McCarthy on Trademarks and Unfair Competition § 11:67 (4th ed. 2013). TAP is thus suggestive and conceptually strong.

2.      *Commercial Strength*

Commercial strength is "the marketplace recognition value of the mark."

King of the Mountain, 185 F.3d at 1093.  It is analogous to secondary meaning.

Water Pik, 726 F.3d at 1154.[13]  We have identified several factors as helpful in

evaluating secondary meaning, including direct evidence of recognition by

consumers and circumstantial evidence regarding: (1) the length and manner of

the mark's use, (2) the nature and extent of advertising and promotion of the

mark, and (3) the efforts made to promote a conscious connection, in the public's

mind, between the mark and a particular product.  Id.  The district court

concluded that Hornady's advertising efforts established the commercial strength

of its mark; DoubleTap challenges that conclusion.  Aplee. Br. 55-56.

Viewing the evidence in Hornady's favor, we agree that TAP is

commercially strong.  First, the TAP mark has been on the market nearly 17

years.  Second, there was evidence that Hornady spent hundreds of thousands of

dollars advertising its TAP products in numerous magazines, on two television

channels, at several trade shows, and on its two websites.  Aplt. App. 1047-48.

These factors demonstrated that Hornady fostered a conscious connection in the

public's mind between the TAP mark and its products.

Because TAP is conceptually and commercially strong, the district court

---

[13]  Although secondary meaning is presumed, the fact that Hornady's mark
is statutorily incontestible does not resolve the commercial strength inquiry.  See
Water Pik, 726 F.3d at 1154 n.5.

correctly weighed this factor in Hornady's favor.

G.    Conclusion

Reviewing the record de novo, we hold that two factors—strength of the mark, and similarity of products and marketing—favor Hornady. The remaining four factors favor DoubleTap. The tilt of the scales does not determine the issue. However, the key inquiry, the similarity of the marks, strongly favors DoubleTap. When this is combined with the high degree of care that consumers exercise when purchasing ammunition, and the lack of evidence that DoubleTap intended to deceive those consumers by copying Hornady's mark, it suggests that consumers are unlikely to be confused. Hornady has not introduced meaningful evidence of actual confusion to dispute this. Thus, Hornady has failed to raise a genuine factual issue regarding the likelihood of confusion, and the district court properly awarded summary judgment to DoubleTap.

AFFIRMED.