# United States Court of Appeals for the Federal Circuit

---

**JOSEPH PHELPS VINEYARDS, LLC,**
*Appellant*

**v.**

**FAIRMONT HOLDINGS, LLC,**
*Appellee*

---

2016-1089

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92057240.

---

Decided: May 24, 2017

---

THOMAS SCHNECK, Law Offices of Thomas Schneck, San Jose, CA, for appellant.

KIMBERLY KOLBACK, Law Office of Kimberly Kolback, Miami, FL, for appellee. Also represented by MIRIAM RICHTER, Richter Trademarks, PL, Wilton Manors, FL.

---

Before NEWMAN, DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed Per Curiam.

Concurring opinion filed by *Circuit Judge* NEWMAN.

PER CURIAM.

Joseph Phelps Vineyards, LLC ("Vineyards") has produced and sold wines bearing the trademark INSIGNIA since 1978. In 2012, Fairmont Holdings, LLC ("Fairmont") received federal registration for the mark ALEC BRADLEY STAR INSIGNIA for cigars and cigar products. On Vineyards' petition for cancellation, the Trademark Trial and Appeal Board ("Board" or "TTAB") denied the petition,[1] stating the finding that:

> while it appears that Petitioner's INSIGNIA branded wine has met with success in the marketplace, we are not persuaded on this record that Petitioner's mark is a famous mark.

TTAB Op. at 8.

The TTAB found that Vineyards' INSIGNIA mark is not a "famous" mark and gave this factor no weight. The TTAB erred in its legal analysis, in analyzing the "fame" of INSIGNIA wine as an all-or-nothing factor, and discounting it entirely in reaching the conclusion of no likelihood of confusion as to source, contrary to law and precedent. As a result of this error, the Board did not properly apply the totality of the circumstances standard, which requires considering all the relevant factors on a scale appropriate to their merits. We vacate the Board's decision and remand for redetermination of the merits of the cancellation petition.

---

[1]   *Joseph Phelps Vineyards, LLC v. Fairmont Holdings*, Cancellation No. 92057240 (TTAB July 6, 2015) ("TTAB Op.").

THE FACTOR OF "FAME"

The TTAB acknowledged: "Fame for confusion purposes arises as long as a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator," citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1374–75 (Fed. Cir. 2005) ("[T]he proper legal standard for evaluating the fame of a mark under the fifth *DuPont* factor is the class of customers and potential customers of a product or service, and not the general public.").

The TTAB applied a legally incorrect standard in applying an all-or-nothing measure of "fame," more akin to dilution analysis. "While dilution fame is an either/or proposition—fame either does or does not exist—likelihood of confusion fame 'varies along a spectrum from very strong to very weak.'" *Id.* (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 1344 (Fed. Cir. 2003)). In examination of INSIGNIA's fame, the applicable viewpoint is that of the relevant market. *Id.* ("[A] mark's renown within a specific product market is the proper standard.").

Vineyards provided evidence that INSIGNIA wine is renowned in the wine market and among consumers of fine wine. The record shows extensive recognition and accolade for INSIGNIA brand wine. Vineyards' INSIGNIA wines were selected as Wine of the Year in 2005 and 1997, with Wine Spectator noting that INSIGNIA wine had by 2005 earned an outstanding score in 26 of its 29 vintages and repeatedly ranked as a "classic," scoring between 95 and 100 points. J.A. 62. Following is a selection from the exhibits presented to the TTAB with the testimony of Joseph Phelps:

   • FOOD AND WINE, October 2011, at 150-152: "INSIGNIA was the first Bordeaux blend produced in Napa Valley . . . and it's still one of the most famous. (It's also one of the best.)." (J.A. 82–83).

• WALL ST. J., March 16, 2012: "Favorite Vintage: 1994 Phelps INSIGNIA, $70 on release. A full-bodied, generous, gorgeous wine that manages to taste youthful as well." (J.A. 79–81).

• THE CAPITAL, February 1, 2012: "Joseph Phelps Napa Valley INSIGNIA 2008 ($200) -- From one of the most respected producers in the Napa Valley, this colossal blend . . . is a wine that will last for decades." (J.A. 87–88).

• WASH. POST, February 24, 1999: "[T]his has to be INSIGNIA, because when l love a Cabernet and don't know what it is, I always guess my beloved INSIGNIA." (J.A. 73).

• BALT. SUN, April 14, 1996: *Fireworks explode at tasting for '94 Joseph Phelps INSIGNIA*, "But even amid the abundance of excellent wines on show at the MacArthur tasting, the INSIGNIA stood out . . . . In more than a decade of attending MacArthur barrel tastings, this was the finest wine I had ever encountered." (J.A. 74).

• VALLEY TIMES, March 8, 2000: "The granddaddy of these so-called proprietary wines is INSIGNIA, introduced by Joseph Phelps Vineyards with the 1974 vintage." (J.A. 75).

• CALIFORNIA GRAPEVINE, Vol. 35, No. 5, p. 65, October-November 2009, at 65: "2006 Joseph Phelps INSIGNIA . . . Very highly recommended. My score 92/100, first place." (J.A. 90).

• QUARTERLY REV. OF WINES, Winter 2009/2010, at 75: "1st Place: Phelps INSIGNIA . . . it's a perennial winner at our annual Best of the Best in California." (J.A. 92).

The record shows INSIGNIA wine served at the White House:

• The White House dinner menu honoring the Prime Minister of Canada, March 14, 2002 (Phelps INSIGNIA 1994).  (J.A. 65).

• The White House Holiday dinner menu dated December 1, 2006 (Joseph Phelps INSIGNIA 2002).  (J.A. 66).

• President's Invitation to a dinner honoring The Governors of the States and Territories dated February 22, 1998 (Phelps INSIGNIA 1994).  (J.A. 69–70).

The record contains many more examples.  We are perplexed at the Board's finding that INSIGNIA wine has no "fame," giving no discernable weight to this factor.  The TTAB applied an incorrect standard, for "fame" is determined from the viewpoint of consumers of like products.  The record shows appreciation by consumers and the wine market of Vineyards' INSIGNIA brand.  It was error to refuse to accord any "fame" to Vineyards' INSIGNIA mark.  The factor of "fame" warrants reasonable weight, among the totality of the circumstances.

CONCLUSION

We vacate the decision of the TTAB solely on the basis that the Board used an incorrect standard for fame and remand for determination of the cancellation petition utilizing the correct standard.

**VACATED AND REMANDED**

Each party shall bear its costs.

# United States Court of Appeals for the Federal Circuit

---

**JOSEPH PHELPS VINEYARDS, LLC,**
*Appellant*

v.

**FAIRMONT HOLDINGS, LLC,**
*Appellee*

---

2016-1089

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92057240.

---

NEWMAN, *Circuit Judge*, concurring.

I agree that the TTAB improperly analyzed the factor of "fame" and that vacatur and remand are appropriate. I believe it to be appropriate, also, that Vineyards' decades of prior usage should receive its proper weight in this consideration, beyond the acknowledgement of simple "priority." However, my primary purpose in writing separately is to call attention to two additional issues that warrant review on remand.

1. The Board, in its analysis of "relatedness," as the *DuPont* factor is called, did not fully consider all aspects of this factor, despite noting that relatedness can be based on use together (TTAB Op. 14), complementarity (TTAB

Op. 12), or simultaneous consumption (TTAB Op. 13, 14). Indeed, the Board found that:

> the evidence suggests that the goods are sold in the same channels of trade to the same purchasers . . . .

TTAB Op. 15, suggesting a degree of relatedness that requires further exploration on remand.

2.  Second, among the factors relevant to the likelihood of confusion analysis, the Board did not include the form of Fairmont's actual use of its registered mark.

These factors are part of the totality of the circumstances, all of which must be considered, each on a sliding scale appropriate to its weight and merit. I would include these aspects in the vacatur and remand, in order to ensure that the redetermination of the cancellation petition properly encompasses all relevant factors.

I

ACTUAL USE OF THE REGISTERED MARK

Responding to Vineyards' argument that in Fairmont's use of ALEC BRADLEY STAR INSIGNIA the word INSIGNIA is in dominant format, the Board simply stated that "[b]ecause the depiction of the mark is in standard character format and Respondent is not limited to any particular presentation, the format in which Respondent currently uses its mark is not at issue." TTAB Op. 9. The Board did not examine the actual use of the mark. However, as the Tenth Circuit has stated, "[a] standard character registration does not override the requirement that likelihood of confusion be measured by the perceptions of consumers in the marketplace, including the effect of packaging." *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1002 n. 2 (10th Cir. 2014). A comparison that "present[s] the mark 'differently from the way that it actually appears on packaging,'" should be

"rejected." *Id.* At a minimum, the appearance and format is a factor to be given appropriate weight.

The specimens submitted in support of the challenged registration show the presentation of Fairmont's mark in commerce, where ALEC BRADLEY is separated from STAR INSIGNIA, and the relative sizes of the words STAR and INSIGNIA are different, as seen in the registration specimens:



J.A. 195.

The Board described ALEC BRADLEY as a "house mark" and stated that "[g]enerally, if the product marks are identical, the addition of the house mark does not avoid confusion, however, 'where there are some recognizable differences in the asserted product marks . . . the addition of a house mark and/or other material to the assertedly conflicting product mark has been determined to render the marks as a whole sufficiently distinguishable,'" TTAB Op. 10, quoting TTAB precedent. The Board found that because the marks at issue possess "recognizable differences," the house mark "does distinguish the

marks." *Id*. However, this analysis did not take into account the actual usage, with separation of ALEC BRADLEY from STAR and INSIGNIA, in a different font and size.

The Board erred in declining to consider "illustrations of the mark as actually used," for precedent recognizes that such illustrations "may assist the T.T.A.B. in visualizing other forms in which the mark might appear." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1353 (Fed. Cir. 2011). Contrary to the Board's assessment, the dominance of the word INSIGNA as used on Fairmont's products is indeed an issue.[1] *Citigroup* explains that consideration of actual use serves to ensure the TTAB visualizes the full breadth of a standard character mark. *Id.* ("[T]he T.T.A.B. used current and past commercial displays of the applied-for mark to inform but not to restrict its analysis of potential displays.").

To the extent that the actual use of the ALEC BRADLEY STAR INSIGNIA mark presents a different impression to the consumer than the standard character mark viewed in the abstract, the Board should recall that the likelihood of confusion inquiry is "viewed through the eyes of a consumer" to determine the commercial impression of the mark. *Duopross Meditech Corp. v. Inviro Med. Devices*, 695 F.3d 1247, 1253–54 (Fed. Cir. 2012).

---

[1] The Fairmont registration states "no claim is made to the exclusive right to use 'STAR INSIGNIA', apart from the mark as shown." (J.A. 21). However, "a disclaimer is irrelevant in determining likelihood of confusion," and "disclaimed matter cannot be ignored." 3 J. McCarthy, Trademarks and Unfair Competition § 19.72 (4th ed. 2014).

Consideration of how the Fairmont registered mark is actually used, and viewed by the consumer, is part of the totality of the circumstances of likelihood of confusion and should be considered on remand.

## II

### THE "RELATEDNESS" OF THE GOODS

Of course, cigars and wine are different. However, as noted in *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1267 (Fed. Cir. 2002), "[e]ven if the goods . . . are not identical, the consuming public may perceive them as related enough to cause confusion about the source or origin." *See In re Shell Oil Co.*, 992 F.2d 1204, 1207 (Fed. Cir. 1993) (the Board is to "consider the degree of overlap of consumers exposed to the respective services, for . . . even when goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source").

The Board treated relatedness as an all-or-nothing factor, although this factor should be analyzed along a sliding scale. As stated in *DuPont*, there is

> no warrant, in the statute or elsewhere, for discarding *any* evidence bearing on the question of likelihood of confusion. Reasonable men may differ as to the *weight* to give specific evidentiary elements in a particular case. In one case it will indicate that confusion is unlikely; in the next it will not. . . . In every case turning on likelihood of confusion, it is the duty of the examiner, the board and this court to find, upon consideration of *all* the evidence, whether or not confusion appears likely. That determination ends the decisional process.

*In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1362 (C.C.P.A. 1973).

As noted *supra*, the TTAB found that "the evidence suggests that the goods are sold in the same channels of trade to the same purchasers." TTAB Op. at 15. Precedent illustrates the factual sensitivity of the question of relatedness. In *Shell Oil*, 992 F.2d at 1207, the court recognized that "[t]he degree of 'relatedness' must be viewed in the context of all factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."

In *In re Licores Veracruz, S.A. de C. V.*, Serial No. 77753913 (TTAB January 26, 2012), the TTAB reached a contrary conclusion on relatedness with respect to rum and cigars, stating:

> in conjunction with the arbitrary nature of the mark MOCAMBO, we find that cigars and rum will be encountered by the same consumers under circumstances that could, because of the identity of the marks, give rise to the mistaken belief that they originate from the same source . . . . In view of the facts that the marks are identical and are a fanciful or arbitrary term, and the goods are related, move in the same channels of trade and are sold to the same consumers, we find that applicant's mark MOCAMBO for "rum" is likely to cause confusion with the mark MOCAMBO for "cigars."

*Id.* at 8, 10–11. In the present case, the TTAB relied on different reasoning: "Thus, the mere fact that two goods are used together in the same setting or venue does not, in and of itself, demand a finding that confusion is likely." TTAB Op.14 (quoting 4 J. McCarthy, on Trademarks and Unfair Competition § 24:26 (4th ed. 2015)). McCarthy cautions that these are fact-bound determinations and that no fact may "demand" a particular outcome. However, it devolves on the TTAB to provide

reasonably consistent rulings on similar facts, to provide premises on which the public can rely.

Here, the Board concluded that wine and cigars are not "related" because they are products differing in both composition and method of manufacture. TTAB Op. 14. However, relatedness is a broad concept; products may exhibit "relatedness" when they "are complementary products sold in the same channels of trade to the same classes of consumers." *See In re Licores Veracruz, supra* (finding that rum and cigars meet the criteria of relatedness). *See also John Walker & Sons Ltd. v. Tampa Cigar Co.,* 124 F.Supp. 254, 256 (S.D.Fla. 1954), *aff'd* 222 F.2d 460 (5th Cir. 1955) ("Whisky and cigars are closely related in distribution and use."); *Geo. A. Dickel Co. v. Stephano Bros.*, 155 USPQ 744 (TTAB 1967) (relying on *John Walker* in finding confusion for whiskey and cigarettes). *But see Schenley Distillers, Inc. v. Gen. Cigar Co.*, 427 F.2d 783 (CCPA 1970) (the court rejected any principle that the same mark on tobacco and alcoholic beverage products necessarily results in likelihood of confusion; the court did not address the relatedness of all tobacco products and all alcoholic beverages under all circumstances).

## CONCLUSION

It is appropriate for the Board to consider and to explain the weight given to all factors in evaluating the totality of circumstances, explaining any departure from holdings in other proceedings. I concur in the judgment of vacatur and remand and would ensure the readjudication of all the relevant factors in the Board's further consideration of the question of likelihood of confusion.